# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **RED RIVER COAL COMPANY, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:17CV00021 |
| ) | |
| **THE SIERRA CLUB, ET AL.,** ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| **SOUTHERN APPALACHIAN MOUNTAIN** ) | |
| **STEWARDS, ET AL.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 2:17CV00028 |
| ) | |
| **RED RIVER COAL COMPANY, INC.,** ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

*Brooks M. Smith, Troutman Sanders LLP, Richmond, Virginia, for Red River Coal Company, Inc.; Peter M. Morgan, Denver, Colorado, Evan D. Johns, Appalachian Mountain Advocates, Charlottesville, Virginia, and J. Michael Becher, Appalachian Mountain Advocates, Lewisburg, West Virginia, for Southern Appalachian Mountain Stewards, Appalachian Voices, and Sierra Club.*

These two related cases involve the Clean Water Act ("the CWA") and the

Surface Mining Control and Reclamation Act ("SMCRA"). Southern Appalachian

Mountain Stewards, Appalachian Voices, and The Sierra Club (collectively,

"SAMS") notified Red River Coal Company, Inc. ("Red River") that SAMS intended to file a citizen suit against Red River alleging violations of the CWA and SMCRA. Red River then filed a declaratory judgment action, Case No. 2:17CV00021, seeking a declaration that it was not violating the CWA and SMCRA, as well as injunctive relief against SAMS. After the expiration of the 60-day statutory notice period, SAMS filed its citizen suit, Case No. 2:17CV00028.

Each party has moved to dismiss the other's lawsuit. Red River contends that this court lacks subject-matter jurisdiction over SAMS's citizen suit and that SAMS has failed to state a claim upon which relief can be granted. SAMS argues that this court lacks subject-matter jurisdiction over the declaratory judgment action and alternatively urges the court to decline to exercise its jurisdiction. Both motions have been fully briefed and are ripe for decision.[1] For the reasons that follow, I will deny Red River's Motion to Dismiss the citizen suit for lack of subject matter jurisdiction and also deny Red River's Motion to Dismiss the citizen suit for failure to state a claim, except as to one aspect of SAMS's Complaint that I conclude is barred by res judicata. I find that this court does have subject-matter jurisdiction over the declaratory judgment action, and in my discretion, I will exercise the court's jurisdiction and deny SAMS's Motion to Dismiss that action.

---

[1] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

## I. SAMS'S CITIZEN SUIT.

### A. Facts.

The following facts are drawn from the Complaint in Case No. 2:17CV00028 and the exhibits filed by Red River in support of its motion to dismiss for lack of subject-matter jurisdiction.

SAMS alleges that Red River, which operates a surface coal mine called the North Fox Gap Surface Mine ("Mine"), is discharging pollutants without permit authorization in violation of the CWA. SAMS also alleges that these discharges violate performance standards under SMCRA and the terms and conditions of the Mine's Virginia SMCRA permit.

The Mine discharges pollutants into the South Fork Pound River, Rat Creek, Stillhouse Branch, and unnamed tributaries. Some of the discharges are governed by effluent limits in the Mine's National Pollution Discharge Elimination System ("NPDES") permit. The discharges include "the ions that contribute to total dissolved solids and conductivity." Compl. ¶ 15, ECF No. 1.

The SMCRA and NPDES permits for the Mine have been in effect since 1992. Red River deposited mine spoil into eight hollow fills, each of which has an underdrain. According to SAMS, these underdrains "channelize and direct the flow of water through the fill and out through the toe of the fill." *Id.* at ¶ 37. Until June 2014, Fill 1 and Underdrain 1 discharged into Pond 1 and through Outfall 001

into a tributary of the South Fork Pound River. Fill 2 and Underdrain 2, as well as Fill 3 and Underdrain 3, discharged into Pond 2 and through Outfall 002 into a different tributary of the South Fork Pound River. Fill 4 and Underdrain 4, as well as Fill 5 and Underdrain 5, discharged into Pond 5 and through Outfall 003 into another tributary of the South Fork Pound River. Fill 6 and Underdrain 6 discharged into Pond 9 and through Outfall 006 into a tributary of Rat Creek, which flows into the South Fork Pound River downstream from the other discharges. Until March 2007, Fill 8 and Underdrain 8 discharged into a sediment pond that was part of the Ambrose Branch Coal Company, Inc.'s Mine #6 ("Ambrose Mine 6") SMCRA permit, which was downslope from the Mine, and then into Stillhouse Branch, a tributary of the South Fork Pound River.

On April 29, 2014, Virginia's Division of Mined Land Reclamation ("DMLR") authorized Red River to remove Ponds 3 and 4. On June 11, 2014, DMLR authorized Red River to remove Ponds 1, 2, 5, 6, and 9. In March 2007, DMLR had released the Ambrose Mine 6 permit. Since March 2007, Underdrain 8 discharges directly into Stillhouse Branch. Since the other ponds have been removed, Underdrains 1, 2, 3, 4, 5, 6, and 8 all discharge directly into tributaries or streams without passing through any pond or treatment system.

On February 26, 2015, in a document titled Monitoring Point Detail Supplement, DMLR authorized the deletion of Outfall 003 from Red River's

NPDES permit.  In the same document, DMLR authorized the relocation of the NPDES monitoring locations for Outfalls 001, 002, and 006.  The monitoring points were previously below the fills but were moved to new locations up slope of the fills at mine bench Ponds 1B, 3B, and 7B.  Red River has not reported any discharges from these mine bench ponds.  Since the ponds were removed and outfalls deleted or relocated, Red River has not reported monitoring data from Ponds 1, 2, 3, 4, 5, 6, and 9, or from the original locations of Outfalls 001, 002, 003, or 006.

According to SAMS, "Underdrains 1, 2, 3, 4, 5, 6, and 8 continue to produce discharges high in total dissolved solids and with high conductivity."  *Id.* at ¶ 50.  These discharges have resulted in elevated levels of total dissolved solids and conductivity in the streams into which the underdrains discharge.  Red River has acknowledged that surface mining activities at the Mine are the cause of the elevated levels in the streams.  These elevated levels have harmed aquatic life in the streams, which the Virginia Department of Environmental Quality has designated as impaired based on macroinvertebrate bioassessments.

SAMS alleges that the underdrains are point sources and that their discharges into the streams are unpermitted now that the ponds have been removed and the permits have been revised.  SAMS specifically alleges that the underdrains

are discharging calcium, magnesium, sulfate, and bicarbonate, thereby violating the CWA. Its claim focuses on discharges occurring after April 14, 2015.

SAMS also asserts a claim under SMCRA. The theory of this claim is that Red River's SMCRA permit requires it to comply with Virginia's SMCRA performance standards, which in turn require compliance with all applicable state and federal water quality laws, standards, and regulations. A state regulation provides that Virginia waters must be free from substances or waste that "are inimical or harmful to human, animal, plant, or aquatic life." 9 Va. Admin. Code § 25-260-20. Another regulation states that surface mining and reclamation activities must be conducted in a way that will "prevent material damage to the hydrologic balance outside the permit area." 4 Va. Admin. Code § 25-130-816.41(a). SAMS alleges that by causing violations of these standards, Red River is violating its SMCRA permit. The regulation also requires that if typical reclamation and remedial practices are inadequate to meet water quality standards, "the permittee shall use and maintain the necessary water treatment facilities or water quality controls." 4 Va. Admin. Code § 25-130-816.41(d)(1). SAMS contends that because the reclamation methods employed are inadequate to ensure compliance with the applicable standards, Red River is violating its SMCRA permit by failing to construct an appropriate treatment system. SAMS's SMCRA

claim, like its CWA claim, is based on alleged violations occurring after April 14, 2015.

SAMS seeks injunctive relief for these alleged violations. It asks the court to enjoin Red River from committing further violations, order Red River to apply for modification of its NPDES permit to add effluent limitations for these discharges from the underdrains, and order Red River to conduct monitoring and sampling and repair the streams to their pre-mining condition. SAMS also seeks to recover its attorneys' fees and costs.

Red River alleges that the discharges at issue are discharges into groundwater rather than surface water. It contends that the valley fills and underdrains do not channel the water, but merely follow the natural slope of the land, and thus they are not point sources. Red River notes that Virginia regulations require the eventual removal of sedimentation ponds as part of the reclamation process. *See* 4 Va. Admin. Code § 25-130-816.84 ("Such structures may not be retained permanently as part of the approved postmining land use.").

Red River submitted a declaration of George Joey O'Quinn of DMLR. O'Quinn stated,

> DMLR has never required underdrains and the associated fills to be permitted as NPDES outfalls. Consequently, it does not require NPDES outfalls for the underdrains and the associated fills at North Fox Gap Surface Mine. Additionally, DMLR does not have a program that could issue NPDES outfalls for underdrains and the

associated fills; consequently, any application for such a permit would have to be denied.

O'Quinn Decl. ¶ 14, ECF No. 12-2.

SAMS submitted a 2001 letter from the United States Environmental Protection Agency ("EPA") to the Pennsylvania Bureau of Mining and Reclamation stating that EPA does not take the position that drainage from abandoned mine sites is non-point-source pollution. Rather, according to the letter, EPA has not determined whether there are unpermitted point source discharges associated with certain abandoned mine sites, nor has EPA determined that the discharges are exempt from NPDES permitting requirements. But Red River notes that EPA's website refers to abandoned mine drainage as a type of non-point-source pollution.

SAMS also submitted a letter from EPA to Red River dated September 20, 2016, that contained a request to show cause ("Show Cause Letter"). The Show Cause Letter stated that "Red River has discharged and continues to discharge pollutants to waters of the United States without a properly issued NPDES permit" from the Mine. Pls.' Resp. in Opp'n to Def.'s Mot. to Dismiss Ex. 3, 2, ECF No. 20-3. A table of violations included with the letter references the deleted outfalls and refers to ongoing violations after the dates on which the outfalls were deleted. Although the Show Cause Letter indicates that EPA intended to initiate enforcement action against Red River, it has not done so. Red River alleges that it

sat down with EPA officials and implies that it assuaged EPA's concerns or otherwise convinced EPA that no action was necessary.

### B. Subject Matter Jurisdiction.

Red River has moved to dismiss SAMS's Complaint for lack of subject-matter jurisdiction. A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the fundamental question of whether the court is competent to hear and adjudicate the claims brought before it. Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways — facial attacks and factual attacks. *See Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir. 1986). When a defendant challenges the factual basis for subject-matter jurisdiction, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id*.

Red River contends that because SAMS does not allege a viable CWA claim, this court does not have subject-matter jurisdiction over this case. Red

River characterizes all of its arguments except its res judicata argument as factual challenges to subject-matter jurisdiction.

The CWA authorizes a citizen suit against a person "alleged to be in violation of" the CWA. 33 U.S.C. § 1365(a)(1). The Supreme Court has held that this provision does not confer federal jurisdiction over suits based on wholly past violations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 58-59 (1987). The Fourth Circuit has stated that "a district court has subject matter jurisdiction over claims in a citizen suit filed under the Clean Water Act that are based on good-faith allegations of a defendant's ongoing violation of the Act." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 402 (4th Cir. 2011).

In the context of the CWA, the line between jurisdictional issues and merits issues is at times blurry. For instance, some courts have held that the CWA does not confer federal jurisdiction over claims regarding non-point-source pollution or discharges into groundwater. *See, e.g.*, *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 252 F. Supp. 3d 488, 493, 498 (D.S.C. 2017). Some have found a lack of federal jurisdiction to review a state permitting decision when the plaintiff failed to appeal the permit determination within the state administrative process. *See, e.g., Potter v. Asarco, Inc.*, No. 8:96CV555, 1999 WL 33537055, at *5 (D. Neb. April 23, 1999). Other courts have held that a citizen suit alleging

unpermitted discharges or exceedence of effluent limits is not a collateral attack on the underlying permitting decisions, and federal jurisdiction is therefore proper. *See, e.g.*, *Sierra Club v. Va. Elec. & Power Co.*, 145 F. Supp. 3d 601, 605-06 (E.D. Va. 2015). The Ninth Circuit has held that an agency's decision "that an NPDES permit is not needed warrants consideration but does not divest the federal courts of jurisdiction. The State may choose to sit on the sidelines, but state inaction is not a barrier to a citizen's otherwise proper federal suit to enforce the Clean Water Act." *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002).

In *San Francisco Baykeeper v. Cargill Salt Division*, the Ninth Circuit addressed the confusing CWA jurisdictional analysis as follows:

> [T]he "jurisdiction" of the CWA has nothing to do with the jurisdiction of this court. Baykeeper's complaint alleged that Cargill had violated the CWA by discharging pollutants into the waters of the United States. That colorable allegation clearly gave the district court jurisdiction over the case, *see* 33 U.S.C. § 1365(a), 28 U.S.C. § 1331, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Baykeeper's failure to establish that Cargill's Pond was a water of the United States is a failure to make out a case, not a failure to establish the jurisdiction of the court. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 1242–45, 163 L.Ed.2d 1097 (2006) (discussing loose use of term "jurisdiction" and holding that failure to establish that defendant is covered by the governing statute is failure to make out a claim, not a failure to establish jurisdiction).

481 F.3d 700, 709 n.9 (9th Cir. 2007).

Based on the limited record before the court, I find that the court has subject-matter jurisdiction over SAMS's claims and will deny Red River's Rule 12(b)(1) motion.  Like the Ninth Circuit, I find that the issues raised by Red River essentially go to whether SAMS has stated claims under the CWA and SMCRA rather than to whether the court has jurisdiction over those claims.  Applying the standard set forth by the Fourth Circuit in *Gaston Copper Recycling*, I find that SAMS has alleged in good faith that Red River is violating the CWA by discharging pollutants from alleged point sources into surface waters without permit authorization to do so.  I conclude that these good-faith allegations are sufficient to invoke the court's subject-matter jurisdiction over SAMS's citizen suit.

## C.  Res Judicata.

Red River contends that a related case filed in this court in 2014 precludes SAMS's claims asserted in this case under the doctrine of res judicata.  *See S. Appalachian Mountain Stewards v. Red River Coal Co.*, No. 2:14CV00024, 2015 WL 1647965 (W.D. Va. Apr. 14, 2015) (hereinafter "*SAMS v. Red River I*") (granting summary judgment in favor of Red River based on deference to DMLR's interpretation of applicable permits).

In *SAMS v. Red River I*, SAMS alleged that Red River was violating its permits at four mines (including the Mine) by exceeding allowable discharges into

- 12 -

the South Fork Pound River, which is subject to a Total Maximum Daily Load

("TMDL"). The key issue in the case was whether the TMDL was incorporated

into the permits through certain permit language. The TMDL in question had been

adopted after the permits were issued. I found that the permit language was

ambiguous. At the summary judgment stage, Red River offered evidence of

DMLR's interpretation of the permit language, and I deferred to that interpretation.

In my opinion granting summary judgment, I wrote:

> In short, although Plaintiffs frame their claims as based on a
> permit violation, they implicitly seek to challenge DMLR's
> interpretation of the permits at issue. An agency's interpretation of, or
> finding of facts under, a regulation that it has the authority to enforce
> is entitled to deference because "[a]dministrative agencies are simply
> better suited than courts to engage in such a process." *Ford Motor
> Credit Co. v. Milhollin*, 444 U.S. 555, 569 (1980). Moreover, courts
> afford special deference in reviewing an agency's findings where the
> agency's particular technical expertise is involved. *Ohio Valley Envtl.
> Coal. v. U.S. Army Corps of Eng'rs,* 674 F.Supp.2d 783, 801 (S.D.W.
> Va. 2009). Finally, because the DMLR is a state agency empowered
> to develop TMDLs for waterways within Virginia, the court must
> adhere to the "strong public policy against a federal court's
> interference in state agency determinations absent some finding that
> the agency has violated federal law." *United States v. Alcoa, Inc.,* No.
> A–03–CA–222–SS, 2007 WL 5272187, at *7 (W.D. Tex. Mar[.] 14,
> 2007); *see also Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 160
> (4th Cir.1993) (refusing to permit "collateral attack" on permitting
> decisions of state environmental agency and federal EPA).

> Plaintiffs have made no attempt to argue that DMLR's findings
> and conclusions regarding the South Fork TMDL are inadequate or
> that they do not comply with federal law. Rather, they allege that Red
> River has violated its permits — a conclusion that DMLR disagrees
> with. Absent a reason to disregard DMLR's findings, which Plaintiffs
> do not present, I find that I must defer to DMLR's determination.

*SAMS v. Red River I*, 2015 WL 1647965, at *4–5.

I noted that after the Complaint in that case was filed, "Red River provided Plaintiffs with evidence that the discharge points supporting Plaintiffs' allegations as to three of the permits have been removed. Therefore, Plaintiffs move for summary judgment solely for ongoing violations in relation to the one remaining permit." *Id.* at *1 n.1. Red River moved for summary judgment on the entire case, which I ultimately granted.

Red River contends that because the ponds were removed and the outfalls were deleted from the permits prior to the filing of the complaint in *SAMS v. Red River I*, my decision in that case precludes SAMS from making any claims regarding unpermitted discharges from those outfalls. SAMS counters that (1) the outfalls were not truly deleted, and its unpermitted discharge claims thus were not available, until February 26, 2015, well after the complaint was filed in *SAMS v. Red River I*; and (2) in the earlier case, SAMS alleged violation of permits, but in this case, it alleges unpermitted discharges, so there is no identity of claims as would be required for res judicata to apply.

Res judicata is an affirmative defense. Fed. R. Civ. P. 8(c)(1). It should be decided on a motion to dismiss only when its applicability is clear from the face of the complaint. *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000).

Res judicata applies where there was a final judgment on the merits in a prior suit resolving claims by the same parties or their privies, and a subsequent suit based on the same cause of action. *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016). In addition, the Fourth Circuit has directed courts to consider whether the plaintiff "knew or should have known of its claims at the time of the first action" and "whether the court that ruled in the first suit was an effective forum to litigate the relevant claims." *Id.* In this case, the pertinent inquiries are whether the two cases are based on the same cause of action (often called identity of claims) and whether SAMS could have asserted its current claims when it filed *SAMS v. Red River I*.

The Fourth Circuit follows a "transactional approach" in determining whether there is an identity of claims. *Id.* at 282. This approach asks whether the new claim is based on the same underlying transaction as the claim in the first suit and whether it could have been asserted in the first suit. *Id.* "[T]o avoid *res judicata*, a plaintiff need not 'expand its suit in order to add a claim that it could not have asserted at the time suit was commenced.'" *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 554 n.2 (4th Cir. 2013) (quoting *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 105 F.3d 72, 78 (2d Cir. 1997)). "In finding that the second suit involves the same cause of action, the court need not find that the plaintiff in the second suit is proceeding on the same

legal theory he or his privies advanced in the first suit." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009). "Even claims that were not raised in the original suit may be precluded if they arose from the same transaction or occurrence as those raised in the first suit and were available to the plaintiff at the time of the first suit." *Id.* at 210–11.

The Fourth Circuit has stated that res judicata is rarely applicable in a case involving a continuing series of acts, as each new act gives rise to a new cause of action. *Meekins v. United Transp. Union*, 946 F.2d 1054, 1058 (4th Cir. 1991). The Supreme Court has also noted that the same course of conduct can give rise to more than a single cause of action, and where the allegedly wrongful conduct occurred after the earlier case, the new claims are not barred by res judicata. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955). But in the environmental context, the Seventh Circuit has held that ongoing releases are not new wrongs where they "were known at the time of the initial suit" and "were the principal basis of the claim." *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1326 (7th Cir. 1992) (noting there was "no new wrongful conduct" by the defendant after the conclusion of the earlier case).

Both the instant case and *SAMS v. Red River I* involve discharges of the same pollutants from the same mine. From the record currently before the court, it appears that Red River has taken no new action to further contribute to the alleged

discharges. The key factual difference is that at the time the first case was filed, those discharges were governed by a permit, and now they are unpermitted. The fact that the outfalls have been deleted from the permit changes SAMS's legal theory. SAMS argues that it could not have alleged unpermitted discharges in 2014. At that time, it could only have alleged discharges in excess of what the permit allowed.

"[R]es judicata does not bar claims that did not exist at the time of the prior litigation." *Meekins*, 946 F.2d at 1057, 1058 (holding that plaintiff's claims "did not exist at the time of the first suit . . . because plaintiffs could not then have obtained the prospective relief that they now seek"). There is a dispute about when SAMS's instant claims became available. SAMS says it could not have asserted a claim for unpermitted discharges until DMLR officially authorized deletion of the outfalls from the permit on February 26, 2015. Red River asserts that SAMS could have brought all of these claims as early as June 11, 2014, when DMLR authorized removal of the sedimentation ponds. It notes that DMLR authorized removal of some of the ponds in April 2014, and the pond into which Fill 8 and Underdrain 8 discharged was removed from the Ambrose Mine #6 permit back in 2007. SAMS filed its earlier suit on June 5, 2014.

A West Virginia district court decision supports SAMS's position that even after a sediment pond has been physically removed, the outfall remains part of the

permit until the state agency takes formal action to delete it from the permit. *Ohio Valley Envtl. Coal., Inc. v. Alex Energy, Inc.*, 12 F. Supp. 3d 844, 867 (S.D.W. Va. 2014). However, SAMS does not address the issue surrounding Fill 8 and Underdrain 8. Any claim regarding Fill 8 and Underdrain 8 would have been available at the time SAMS filed its earlier lawsuit in 2014, because that pond was removed from its respective permit in 2007. I conclude that SAMS's claim regarding Fill 8 and Underdrain 8 is barred by res judicata. I find that SAMS's other claims are not barred by res judicata because they were not legally available at the time SAMS filed its earlier suit.

### D.  Agency Deference.

Red River urges the court to defer to DMLR's conclusion that Red River is not violating its permit or the applicable laws. DMLR allegedly has never required reclaimed fills or associated underdrains to be permitted as outfalls or point sources. According to Red River, DMLR exercised its technical expertise in determining that discharges from reclaimed fills do not need to be permitted.

SAMS contends that DMLR's interpretation is not entitled to deference because it is inconsistent with an EPA regulation requiring permits for discharges from inactive mining operations. SAMS further argues that EPA's Show Cause Letter is entitled to greater deference than DMLR's decision.

The Fourth Circuit has adopted "a two-step analysis for reviewing state

agency interpretations of federal laws." *Clark v. Alexander*, 85 F.3d 146, 152 (4th Cir. 1996). "First, the court should determine whether the state agency action is inconsistent with the federal" regulations. *Id.* "If there is no inconsistency, the court should afford the state agency's action reasonable deference, meaning that the action should be upheld unless it is found to be arbitrary or capricious." *Id.* "In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Aracoma Coal Co.*, 556 F.3d at 192. "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Id.* (internal quotation marks and citations omitted).[2]

The Ninth Circuit has spoken to the tension between agency deference and the CWA's citizen suit provision. "The purpose of the citizen suit provision of the CWA, 33 U.S.C. § 1365, is to permit citizens to enforce the Clean Water Act when the responsible agencies fail or refuse to do so." *S.F. Baykeeper*, 481 F.3d at 706.

> On occasion . . . a citizen sues because of a discharge that the EPA has elected not to regulate. If the decision of the EPA is given conclusive deference, the citizen suit would be defeated. Suit is therefore allowed despite the EPA's inaction, and a court may decide whether the offending substance is a pollutant even when the EPA has not

---

[2] The Fourth Circuit has noted that state agencies are afforded greater deference under SMCRA than under the CWA. In a SMCRA primacy state, the state's regulation of surface mining is "exclusive." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 294 (4th Cir. 2001).

decided that question. Thus, we have held that a court may, in entertaining a citizen suit, decide whether a discharge of particular matter into navigable waters violates the CWA even though the regulating agency determined that the discharge was not subject to the requirement of a permit.

*Id.* (internal quotation marks and citations omitted). In another case, the Ninth Circuit held that a state "has no authority to create a permit exemption from the CWA for discharges that would otherwise be subject to the NPDES permitting process." *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1164 (9th Cir. 2003). Other courts have ruled similarly. For instance, a judge of the Eastern District of Tennessee held that "[w]hether several locations at [a plant] are point sources for pollution is a question within the competence of courts. Accordingly, deferal [sic] to EPA would not be appropriate in this case." *Legal Envtl. Assistance Found., Inc. v. Hodel*, 586 F. Supp. 1163, 1169 (E.D. Tenn. 1984) (internal citation omitted).

The EPA regulation that SAMS contends is inconsistent with DMLR's decision requires permits for storm water discharges associated with industrial activities. 40 C.F.R. 122.26. Inactive mining operations are expressly included, subject to an exception for "areas of coal mining operations no longer meeting the definition of a reclamation area under 40 CFR 434.11(1) because the performance bond issued to the facility by the appropriate SMCRA authority has been released."

40 C.F.R. 122.26(b)(14)(iii).[3]

Red River asks the court to defer to the position of DMLR based on a declaration executed by one of its representatives, George Joey O'Quinn, a Reclamation Program Manager. O'Quinn Decl., ECF No. 12-2. Red River has not indicated that DMLR's position is the result of any formal regulatory or adjudicatory process. DMLR's position may conflict with EPA's position as stated in its Show Cause Letter to Red River, but I cannot say for sure based on the record before me, particularly in light of the fact that EPA has not taken any action after issuing the letter and subsequently conferring with Red River.

I find that there are unresolved factual questions bearing upon whether it is appropriate to defer to DMLR under these circumstances. Therefore, I will deny the motion to dismiss on the ground of agency deference because further development of the record is necessary.

### E.  Point Source.

"To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). The statute contains no causation

---

[3] Red River does not mention this exception, and from the record currently before the court, it is unclear whether the reclamation bond for the Mine has been released.

requirement and "takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur." *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010).

Red River contends that underdrains are not point sources and thus are not subject to the CWA's permit requirement.[4] SAMS disagrees, arguing that at a minimum, there is a factual dispute as to whether the underdrains at issue here are point sources.

The CWA's definition of "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "[A]gricultural stormwater discharges and return flows from irrigated agriculture" are excluded from the definition of point source. *Id.*

A regulation promulgated under the CWA defines "discharge of a pollutant" as "[a]ny addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source.'" 40 C.F.R. 122.2. "This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man . . . ." *Id.* As noted above, another

---

[4] Red River asserts that SAMS conflates underdrains and hollow fills, but that the Complaint alleges only that the underdrains are point sources, not the hollow fills.

regulation requires a permit for any storm water "discharge associated with industrial activity," which includes inactive mining operations except where the SMCRA performance bond has been released. 40 C.F.R. 122.26(a)(1)(ii), (b)(14)(iii).

In 1990, explaining a final rule regarding storm water discharges, EPA wrote,

> One industry argued that the definition of "point source" should be modified for storm water discharges so as to exclude discharges from land that is not artificially graded and which has a propensity to form channels where precipitation runs off. EPA intends to embrace the broadest possible definition of point source consistent with the legislative intent of the CWA and court interpretations to include any identifiable conveyance from which pollutants might enter the waters of the United States.

National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990-01 (Nov. 16, 1990). EPA went on to state,

> Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the (discharger) at least initially collected or channeled the water and other materials. A point source of pollution may also be present where (dischargers) design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the (dischargers) have done nothing beyond the mere collection of rock and other materials.

*Id.*; *see also Sierra Club v. Abston Constr. Co.,* 620 F.2d 41, 45 (5th Cir. 1980) (stating same).

Regarding reclaimed inactive mining operations, EPA wrote:

> EPA's definition of active and inactive mining operations also excludes those areas which have been reclaimed under SMCRA . . . . EPA believes that, as a general matter, areas which have undergone reclamation pursuant to such laws have concluded all industrial activity in such a way as to minimize contact with overburden, mine products, etc. EPA and NPDES States, of course, retain the authority to designate particular reclaimed areas for permit coverage under section 402(p)(2)(E).

*Id.*

> In a different rule issued in 1985, EPA

> reemphasize[d] that post-bond release discharges are subject to regulation under the Clean Water Act. If a point source discharge occurs after bond release, then it must be regulated through an NPDES permit under sections 301(a) and 402 of the Clean Water Act. If the responsible party does not obtain a permit, then it is subject to enforcement action by EPA under section 309 of the Act and by citizens under section 505(a)(1) of the Act."

Coal Mining Point Source Category; Effluent Limitations Guidelines and New Source Performance Standards, 50 Fed. Reg. 41296-01 (Oct. 9, 1985); *see also W. Va. Highlands Conservancy*, 625 F.3d at 166 (finding, based on this rule, that point source discharges after bond release must be permitted).  But five years earlier, EPA had written that "once OSM authorizes removal of the sedimentation pond or treatment facility, and the performance bond is fully released, there generally will be no basis to apply EPA effluent limitations because there will generally be no point source."  Coal Mining Point Source Category; Effluent Limitations Guidelines for Existing Sources, Standards of Performance for New Sources and

Pretreatment Standards, 46 Fed. Reg. 3136-01 (Jan. 13, 1981). However, EPA went on to "emphasize[] that, in the rare instance where such a point source discharge occurs [following reclamation], the appropriate permitting authority may require treatment under section 402(a)(1) of the Clean Water Act." *Id.*

A judge of the Southern District of West Virginia considered a case with similar facts to this one, where the "central issue" was whether "valley fills are 'point sources,' therefore requiring NPDES permits." *Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*, Civil Action No. 3:14-11333, 2015 WL 2144905, at \*7 (S.D.W. Va. May 7, 2015). In that case, the court denied a motion for summary judgment because there were issues of material fact bearing on whether the fills were point sources. *Id.* The court expressly found that "[w]hether a discharge from a point source exists is a question of fact." *Id.* at \*8 (citing *Abston*, 620 F.2d 41). The court also held that a permit may be required for discharges occurring after bond release. *Id.* at \*9.

I find that SAMS has adequately pleaded that the underdrains in question are point sources. I will deny Defendant's Motion to Dismiss on this ground, as the record currently before me does not contain sufficient facts for me to rule as a matter of law that the underdrains in question are not point sources.

## F.  Groundwater.

Under the CWA, "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12). "Navigable waters" is defined as "the waters of the United States."  33 U.S.C. § 1362(7).

Red River argues that the discharges at issue here are discharges into groundwater rather than surface water, and groundwater is not included in the definition of navigable waters under the CWA.  SAMS disputes Red River's factual predicate and alleges that the discharges at issue are occurring at the surface.  SAMS also argues that groundwater hydrologically connected to surface water does meet the statutory definition of navigable waters.

EPA has taken the position, and a number of courts have found, that the CWA regulates discharges of pollutants into groundwater that is directly hydrologically connected to surface water.  *See, e.g., Sierra Club v. Va. Elec. & Power Co.*, 247 F. Supp. 3d 753, 761-62 (E.D. Va. 2017); *Ohio Valley Envtl. Coal.*, 2015 WL 2144905 at *8.  *But see Upstate Forever*, 252 F. Supp. 3d at 496 (noting that "the two circuit courts to address this issue have concluded that navigable waters does not include groundwater that is hydrologically connected to surface waters") (citing *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962 (7th Cir. 1994); *Rice v. Harken Expl. Co.*, 250 F.3d 264 (5th Cir. 2001)).

At this procedural juncture, I need not decide whether the CWA covers discharges into hydrologically connected groundwater because SAMS has alleged that the discharges in question occur at the surface. The parties do not dispute that the sediment ponds were point sources that discharged pollutants into various tributaries, creeks, and other bodies of surface water. Now that the ponds have been removed, the underdrains allegedly discharge the same pollutants directly into those bodies of water. At this stage of the proceedings, I find that SAMS has alleged sufficient facts to overcome the Motion to Dismiss as to Red River's groundwater argument.

### G. Burford *Abstention.*

Red River argues that I should decline to hear SAMS's citizen suit under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), because the case presents difficult questions of state law. *Burford* abstention is appropriate where a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726-27 (1996) (internal quotation marks and citations omitted). The abstention decision is a discretionary one. *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th Cir. 2008).

Nevertheless, "although the standard is a deferential one, the discretion to abstain is tempered by the truism that the federal courts have a virtually unflagging obligation to exercise their jurisdiction" and "[t]here is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Id.* at 280 (internal quotation marks and citations omitted).

Red River largely bases its *Burford* argument on the predicate that Congress opted to leave groundwater regulation to the states. This argument is not particularly persuasive at this stage because, as indicated above, SAMS has alleged discharges into surface water rather than groundwater. Red River also argues that SAMS's suit is really an impermissible collateral attack on the state permitting process. That would be the case if DMLR had issued a permit for the alleged discharges and SAMS was challenging the propriety of the permit or technical deficiencies in the permitting process. *See Palumbo*, 989 F.2d at 158 (finding *Burford* barred federal court from ruling on claim challenging validity of permits issued under Resource Conservation and Recovery Act where plaintiffs' appeal of state agency's permitting decision was pending before state administrative review board). But a CWA citizen suit is proper where a state agency fails to enforce the CWA or attempts to create an exception where a CWA permit would otherwise be required. *See S.F. Baykeeper*, 481 F.3d at 706.

Red River's *Burford* argument is similar to its agency deference argument. I do not believe that SAMS's Complaint raises difficult issues of state law. Rather, SAMS seeks to enforce *federal* law that it contends DMLR is failing to enforce. Unlike in *Palumbo*, there is no pending state appeal in this case. As abstention is the exception rather than the rule, I decline to abstain under *Burford* and will exercise jurisdiction over this case.

### H. Conclusion.

For the foregoing reasons, I will grant Red River's Motion to Dismiss the portion of SAMS's Complaint regarding discharges from Underdrain 8 and Fill 8 on the ground that it is barred by res judicata. I will deny Red River's Motion to Dismiss on all other grounds.

### II. RED RIVER'S DECLARATORY JUDGMENT ACTION.

In its declaratory judgment action, Red River raises essentially the same issues as in its Motion to Dismiss SAMS's citizen suit. It contends that SAMS's claims are barred by res judicata, that the CWA does not cover groundwater, that the underdrains and hollow fills are not point sources, and that DMLR's determination that Red River is not violating its permit is entitled to deference. Red River seeks a judicial declaration of each of these points, as well as an injunction "enjoining Defendants from filing additional citizen suits against Red River alleging CWA and SMCRA violations associated with discharges from

underdrains and hollow or valley fills." Case No. 2:17CV00021, Compl. 18, ECF No. 1.

SAMS has moved to dismiss Red River's Complaint pursuant to Rules 12(b)(1) and 12(b)(6), contending that the suit amounts to no more than an assertion of defenses to the citizen suit and that neither the CWA nor SMCRA allows for such a suit.

The Declaratory Judgment Act provides, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Because the Declaratory Judgment Act does not confer federal jurisdiction, the court must "possess[] an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction)." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004).

Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. According to the well-pleaded complaint rule, federal question jurisdiction exists only where "a federal question appears on the face of a plaintiff's properly pleaded complaint." *Columbia Gas Transmission Corp. v. Drain*, 237 F.3d 366, 370 (4th Cir. 2001). But the Fourth Circuit has clarified that

in a declaratory judgment action, the federal right litigated may belong to the declaratory judgment defendant rather than the declaratory judgment plaintiff. Thus, if the declaratory judgment plaintiff is not alleging an affirmative claim arising under federal law against the declaratory judgment defendant, the proper jurisdictional question is whether the complaint alleges a claim arising under federal law that the declaratory judgment defendant could affirmatively bring against the declaratory judgment plaintiff.

*Id.*; *see also City Nat'l Bank v. Edmisten*, 681 F.2d 942, 945 (4th Cir. 1982) (explaining that "in an action for a declaratory judgment, if the plaintiff is seeking a declaration that it has a good defense to a threatened action, it is the character of the threatened action and not of the defense which determines whether there is federal question jurisdiction").

That is clearly the situation here, and SAMS's citizen suit arises under the CWA and SMCRA — both federal laws. I find that federal question subject-matter jurisdiction exists over Red River's declaratory judgment action, and I will deny the Motion to Dismiss for lack of subject-matter jurisdiction.

SAMS contends that even if this court has subject-matter jurisdiction over Red River's declaratory judgment action, it should exercise its discretion and decline to hear the case. "A federal court has the discretion to decline to entertain a declaratory judgment action, but, under the law of this Circuit, the court must do so only for good reason." *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994) (internal quotation marks and citation omitted).

A district court should entertain a declaratory judgment action within its jurisdiction when the declaratory relief will be useful in clarifying the legal issues presented and will relieve the parties of the uncertainty surrounding the controversy. *Id.* In deciding whether to hear a declaratory judgment action, the court should consider whether the case primarily raises questions of state law, whether claims are pending in state court, whether the federal court's resolution of the issues would result in unnecessary entanglement of the state and federal courts, and whether the federal declaratory judgment action is a means of forum shopping. *Id.* at 966-68. Additionally, "the declaratory remedy should not be invoked merely to try issues or determine the validity of defenses in pending cases." *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937).

Here, there are no concerns about forum shopping and no related cases pending in state court. Both SAMS's citizen suit and Red River's declaratory judgment action are pending in the same court. Although Red River filed its Complaint before the expiration of the statutory notice period for SAMS's citizen suit, that notice period has now run, and these two cases have been consolidated for purposes of discovery and trial. The issues in these two cases are almost entirely parallel, and hearing both cases should not require any additional expenditure of judicial resources. I see no good reason to decline to exercise

jurisdiction over Red River's declaratory judgment action. Therefore, I will deny SAMS's Motion to Dismiss.

### III. CONCLUSION.

For the foregoing reasons, it is hereby **ORDERED** that:

1.      Defendant's Motion to Dismiss in Case No. 2:17CV00028, ECF No. 11, is GRANTED IN PART and DENIED IN PART. The plaintiffs' claims regarding discharges from Underdrain 8 and Fill 8 are DISMISSED, and the Motion to Dismiss is DENIED in all other respects;

2.      The Motion to Dismiss Plaintiff's Complaint with Prejudice in Case No. 2:17CV00021, ECF No. 13, is DENIED; and

3.      The stay of discovery in both cases is lifted as of the date of entry of this Opinion and Order.

ENTER: January 19, 2018

/s/ *James P. Jones*
United States District Judge