**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

SOUTHERN APPALACHIAN MOUNTAIN
STEWARDS, APPALACHIAN VOICES,
and SIERRA CLUB,

     Plaintiffs,

v.             CIVIL ACTION NO. 2:17-cv-00028

RED RIVER COAL COMPANY, INC.,

     Defendant.

RED RIVER COAL COMPANY, INC.,

     Plaintiff,

v.             CIVIL ACTION NO. 2:17-cv-00021

SOUTHERN APPALACHIAN MOUNTAIN
STEWARDS, APPALACHIAN VOICES, and
THE SIERRA CLUB

     Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Red River Coal Company, Inc.'s North Fox Gap Surface Mine discharges pollutants from

hollow fill underdrains into tributaries of the South Fork of the Pound River.  Virginia has

classified that river under the Clean Water Act ("CWA") as biologically impaired by those

pollutants. Those discharges are not authorized by a permit or otherwise regulated under the

CWA, the Surface Mining Control and Reclamation Act ("SMCRA"), or the Resource

Conservation and Recovery Act ("RCRA"). Southern Appalachian Mountain Stewards,

Appalachian Voices and Sierra Club (collectively "SAMS") brought the present action to enforce

1

the CWA's prohibition on unpermitted discharges of pollutants, SMCRA's prohibition on discharges that violate water quality standards, and/or RCRA's prohibition on releases of solid waste that endanger the environment. Red River, via its Motion for Summary Judgment, seeks complete relief from liability under all three of these statutes for its ongoing discharges. To support its Motion, Red River has taken positions in its memorandum of law that contradict previous legal interpretations adopted by it and by the Virginia regulators, and that are inconsistent with a conditional concession that it offers solely for the purpose of its Motion.

SAMS contends that Red River's discharges from its hollow fill underdrains 1 through 6 are required to be permitted under the CWA, but are not covered by its current National Pollutant Discharge Elimination System ("NPDES") permit, because Virginia deleted from that permit the outfall points where the underdrains discharge.  The U.S. Environmental Protection Agency ("EPA") expressly adopted this same position in a "Show Cause" notice of violation it sent to Red River in 2016. SAMS further contends—consistent with the position of the U.S. Office of Surface Mining, Reclamation and Enforcement ("OSM")—that regardless of whether the underdrains are covered by the NPDES permit, SMCRA requires compliance with water quality standards. Finally, SAMS alleges that, because the hollow fills are composed of waste materials, pollution emanating from them does not comply with RCRA. Red River moved for summary judgment on each of SAMS's claims.

## STATEMENT OF FACTS

1.      On August 2, 2017, SAMS filed this action, alleging that Red River Coal Company, Inc. ("Red River") is illegally discharging pollutants, including ions contributing to total dissolved solids and conductivity, in violation of the CWA and SMCRA. *See generally,* Doc. 1, SAMS' Complaint.

2.      On February 1, 2018, SAMS amended its complaint to add claims under the RCRA based on the previously alleged facts. *See* Doc. 34.

3.      The discharges at issue in this action are from six hollow fill underdrains on Red River's North Fox Gap Surface Mine. Doc. 34 at 11–13.

4.      Each of these hollow fills discharges pollutants into tributaries of the South Fork of the Pound River, or Rat Creek (itself a tributary of the South Fork of the Pound River). *See* Ex. 1, OSM "Hydrologic Investigation for Red River Coal, Inc. Virginia Permit Nos. 1100044, 1101401, and 1101769," Nov. 7, 2016, at Figure 3.[1]

5.      The South Fork of the Pound River has been identified by the state of Virginia and the EPA as failing to meet water quality standards related to the health of biological communities in that river. Ex. 2, EPA Letter from John Capacasa, April 28, 2011 (approving Virginia's TMDL for the South Fork of the Pound River).

6.      Virginia has determined that this failure to meet water quality standards is due to excess pollution in the form of Total Suspended Solids ("TSS") and Total Dissolved Solids ("TDS"). *Id.*

7.      TDS is a direct measure of the concentration of dissolved materials in water. It is often considered in conjunction with the parameter of conductivity to assess the ionic concentrations of water. *Ohio Valley Environmental Coalition v. Elk Run Coal Co.*, 24 F. Supp. 3d 532, 568 (S.D.W.Va. 2014) (explaining "conductivity measures the electrical current created by dissolved ions, [] total dissolved solids measures the mass of those *same* ions"); *id.* at 578 ("The water chemistry of these streams has been dramatically altered, containing levels of ionic

---

[1] SAMS' exhibit 20 is a Declaration of Peter Morgan authenticating exhibits 1, 4-6, 8-9, 11, 16, and 18.

salts—measured as conductivity—, which are scientifically proven to be seriously detrimental to aquatic life.").

### PERMITTING OF REMINING OF THE NORTH FOX GAP SURFACE MINE

8.      In 1992, the Virginia Department of Mines, Minerals, and Energy ("DMME"), through its Division of Mined Land Reclamation ("DMLR"), issued a combined SMCRA/CWA permit 1101401/0081401 to Red River to conduct Coal Surface Mining Operations ("CSMO") at its North Fox Gap Surface Mine and to discharge pollutants from its mining operations under the National Pollutant Discharge Elimination System ("NPDES"). Doc.43-3, 1992 permit. Although DMLR authorized the activities under a joint SMCRA/CWA permit, it engaged in separate analyses of the proposed operation's compliance with the SMCRA and CWA NPDES regulatory schemes, and addressed the respective regulatory requirements in separate components of the permit. Ex. 3 at 13-14, Deposition of Rodney Baker, August 30, 2018.

9.      The SMCRA portion of the combined permit authorized "remining" of a previously disturbed area, in which coal had been extracted prior to the enactment of SMCRA. As such, DMLR granted the permit with the understanding that the "proposed mining operation should result in an appreciable improvement in surface water quality." Ex. 4 at 104, Red River 1991 Application for Permit 1101401.

10.      In regards to TDS, Red River's application claimed that "after disturbed areas have been revegetated, total dissolved solids concentrations should decrease to pre-mining levels in the non-remining area. In the remine area, post-mining levels will be even less than existing levels due to reclamation of the exposed slopes." *Id.* at 104A.

11.      Contrary to the assumptions under which the permit was issued, measures of TDS—and the associated measure of ionic concentration, conductivity—have remained elevated

in streams receiving discharges from the site. Since re-mining has taken place TDS levels have not gone down, but have in fact gone up, even though both Red River and DMLR consider reclamation to be complete in the areas drained by hollow fills 1 through 6. In the application section for its most recent permit renewal, titled "Probable Hydrologic Consequences Determination," Red River admitted that "[u]nderdrains UD-1, 2, 3,4, and 6 continue to show elevated levels for parameters TDS, conductivity and sulfates" (Ex. 5 at REDRIVER_00024852, Probable Hydrologic Consequences Determination from 2016 Application for Permit 1101401) and that "[c]onductivity, total dissolved solids, and sulfate values have fluctuated, but on average appears to have increased somewhat from baseline results" (*id*. at REDRIVER_00024857).

12.    In the spring of 2014, despite the continued water quality problems, and continued contribution of TDS to a stream failing to meet water quality standards, DMLR modified Red River's NPDES permit and authorized the removal of sediment control ponds that served as CWA compliance points below each of hollow fills 1 through 6. Doc. 43-12, DMLR inspection report.  The DMLR inspector noted that the area controlled by the structures had been revegetated for a period of two years. *Id*.

13.    As part of that permit modification, DMLR moved Red River's CWA compliance points to areas upslope of and away from the hollow fill underdrains. In a "Monitoring Point Detail Supplement" dated February 26, 2015, DMLR authorized the deletion of Outfall 003 (below Underdrains 4 and 5) from Red River's NPDES permit. Doc. 43-13. In the same "Monitoring Point Detail Supplement," DMLR authorized the relocation of the NPDES monitoring locations for Outfall 001 (below Underdrain 1), Outfall 002 (below Underdrains 2 and 3) and Outfall 006 (below Underdrain 6) from their prior locations below the fills to new locations upslope of the fills on the mine bench. *Id*. at 3. These new outfall locations rarely

discharge.  Doc. 43-7 at 48, 2016 NPDES permit.  SAMS' Complaint does not allege any violations relating to these on bench outfalls.

14.     Water quality in streams below the North Fox Gap Surface Mine has continued to deteriorate after Red River removed the ponds below the six hollow fills. Levels of TDS and conductivity continue to increase. From 2010 until 2016, Red River's contractor took conductivity samples in conjunction with aquatic life benthic monitoring in the South Fork of the Pound (below the mine) and in Rat creek (below the mine and approximately at baseline point at point B-9). *See* Ex. 6, Compiled benthic reports from Biological Monitoring, Inc.  The following chart provides instream levels of conductivity taken by Red River's contractor in conjunction with aquatic life benthic monitoring in the South Fork of the Pound River and Rat Creek from 2015 and 2016 (after Red River removed the ponds below its hollow fills).

| Location | Conductivity (Fall 2015) | Conductivity (Fall 2016) |
|---|---|---|
| South Fork Pound River | 2100 | 2230 |
| Rat Creek | 1626 | 1960 |

15.     In the Spring and Fall of 2018, SAMS representatives visited the site and recorded the TDS and conductivity levels at the points where the hollow fills discharge and downstream in the streams receiving direct discharges from the fill underdrains. TDS exceeded 1,100 mg/L at every location and conductivity ranged from approximately 2,070 µS/cm to 3,670 µS/cm.  These values are well above the pre-mining baseline levels in all of the unnamed tributaries below the hollow fills. *Compare* Ex. 4 at 88-99, 1991 Permit Application;[2] *with* Ex. 7, Kendra Hatcher, "Monitoring Results: North Fox Gap Surface Mine, Wise County, Virginia," Sept. 5, 2018.

---

[2] Fig. 3 of Ex. 1, 2016 OSM Hydrological Investigation, shows the locations of each of the baseline monitoring locations. B-3 is below present-day fills 4 and 5. B-4 is below present-day fill 3.  B-5 is below present-day fill 2.  And, B-7 is below present-day fill 6. Ex. 1 at SAMS00668.

6

16.     Underdrains from hollow fills 1 through 6 are the major source of poor water quality in streams below the mine. The table below compares the pre-mining baseline levels of ionic pollution from each underdrain location to a summary of the post-mining discharges from those underdrains, compiled from Red River's Monitoring data.

| Location | 1992 TDS Level (mg/L) | 2012-17 TDS range (mg/L) |
|----------|----------------------|--------------------------|
| Fill 1/ UD-1 | 1018 | 1018-3356 |
| Fill 2/ UD-2 | 1339 | 1990-4148 |
| Fill 3/ UD-3 | 1546 | 1568-3372 |
| Fill 4/ UD-4 | 798 | 952-2330 |
| Fill 5/ UD-5 | 776 | 1986-3256 |
| Fill 6/ UD-6 | 420 | 1698-2488 |

See Ex. 8, 2005 Mid-term Review of Permit 1101401, Determination of Probable Hydrologic Consequences (1992 levels); Ex. 9, Compiled Red River Coal Company Monitoring reports (2012-17 levels). Data from SAMS' sampling show that TDS from underdrains in the remining area has not improved from baseline levels, and TDS from the hollow fill underdrain outside the remining area (Fill 6/UD-6) is still being discharged at two to three times greater than the baseline levels. Ex 7, Hatcher Report.

**EPA Specific Objection to Permit**

17.     In October 2015, DMLR issued a draft NPDES renewal permit for the North Fox Gap Surface Mine that did not identify any outfall locations associated with underdrain flow from hollow fills 1 through 6. Ex. 10 at 1, EPA Letter to DMLR, January 28, 2016.

18.     On January 28, 2016, EPA objected to the issuance of this draft NPDES permit because of its failure to address discharges from the hollow fill underdrains or to address TDS contributions from those locations. *Id*. EPA explained, "[i]t is our understanding that this facility continues discharging TDS from the original outfall locations. As set forth above, that ongoing

discharge from the original outfall locations needs a permit, regardless of whether the discharges are deemed to be associated with active mining activity." *Id.* at 2

19.      In its objection letter, EPA recognized that the lack of permit control for the hollow fill discharges would have negative impacts on the South Fork Pound River, explaining that "EPA's objection is based on the fact that the permit does not contain sufficient conditions to ensure compliance with water quality standards. . . ." *Id.* at 1 (citing 40 C.F.R. § 122.44(d)(1)(vii)(B)).

20.      On March 15, 2016, Red River's counsel wrote to DMLR concerning the EPA objection to the permit. The letter stated that EPA's objection represented a "fundamental misunderstanding of the facts" because, "[w]here a sediment control pond has been removed, reclaimed and re-vegetated as part of post-mining reclamation and bond release, the physical 'point source' conveyance is removed and drops out of the NPDES permitting program." Ex. 11, Letter from Red River to DMLR, March 15, 2016.

21.      On April 8, 2016, DMLR responded to EPA regarding the federal agency's objection.  DMLR stated its disagreement with EPA's objection noting that "[n]o constructed discharges or siltation structures exist at the original discharge locations," because "[t]he areas have been reclaimed and streams restored per the joint permit requirement." Ex. 12 at 2, DMLR Letter to EPA, April 8, 2016.

22.      DMLR issued Red River's final NPDES permit for the North Fox Gap Surface Mine, despite the EPA objection, on August 5, 2016. *See* Ex. 13, Letter from EPA to DMLR, Nov. 17, 2016.

23.      On September 20, 2016, EPA issued a "show cause" letter to Red River indicating that it believed discharges from underdrains 1 through 6 (among others) on the North Fox Gap

Surface Mine were discharges from a point source without a permit, in violation of 33 U.S.C. § 1311. Ex. 14, EPA Letter to Red River, September 20, 2016.

24.     On November 17, 2016, EPA formally replied to DMLR's April 8, 2016 response to EPA's permit objections. The letter reiterated EPA's position that the discharges from underdrains on the North Fox Gap Surface Mine were not covered by the NPDES permit. Ex. 13, EPA Letter to DMLR ("VA DMME indicated in its response that no 'constructed' discharges or siltation structures exist at the original discharge locations. . . . To the extent there are post-bond release discharges, then those must be regulated through an NPDES permit under sections 301(a) and 402 of the CWA.").

## OSM Action on 10-Day Notice

25.     The federal OSM became involved in the issues of pond removal and underdrain discharges as the result of a citizen complaint. Ex. 15, OSM Letter to DMLR, Dec. 15, 2015.

26.     In a review of the citizen complaint, OSM's Regional Director reminded DMLR that "[r]emoval of ponds does not negate the obligations for compliance with water quality standards." *Id.* at 6. Interpreting the preamble to the federal mining regulations promulgated under SMCRA, the OSM Regional Director stated, "The preamble is clear on the operator's obligation to assure water quality standards are met. If water that is not in compliance with permit conditions or the approved program is leaving the site, the DMLR is obligated to require treatment." *Id.*

## ARGUMENT

Red River has failed to establish that it is entitled to summary judgment on any of the claims alleged in SAMS' Amended Complaint.

Red River's motion for summary judgment on SAMS's CWA claim for unpermitted discharges fails for two reasons. First, Red River's discharges from its six underdrains are not authorized by its permit. Red River concedes that those underdrain locations are point sources. Doc. 43 at 22. Those locations are not listed as outfalls in its permit. In the CWA, Congress prohibited dischargers from discharging pollutants from point sources unless those point sources are listed in their permits. Second, Red River's discharges are not protected by the CWA's § 402(k) permit shield. EPA has interpreted that shield to apply only to "operations that have been clearly identified in the permit application process *where discharged from specified outfalls.*" Since the permit does not specify or otherwise authorize discharges from the underdrain outfalls, there is no permit shield for those discharges.

In any event, even if the CWA permit shield did apply, Red River is not entitled to summary judgment on SAMS's SMCRA claim. Red River's SMCRA permit provides an alternative basis for liability, because it also requires compliance with water quality standards. SMCRA's savings clause does not change that result, because that clause only displaces SMCRA standards that are inconsistent with the CWA. 30 U.S.C. § 1292(a). SMCRA and the CWA are consistent. Both require compliance with water quality standards. A savings clause cannot be used to destroy a central objective of both statutes.

Finally, Red River is not entitled to summary judgment on SAMS's alternative RCRA claim. SAMS will pursue that alternative claim only if the Court decides that Red River's underdrains are not point sources. In that event, the discharges are not subject to the CWA and become subject to RCRA. *See* 42 U.S.C. § 6903(27). Red River cannot obtain summary judgment on that claim by conceding, "for purposes of this motion only," that its underdrain discharges are from point sources. Such a conditional "concession" of fact is insufficient to

10

support summary judgment. *Lloyd v. Franklin Life Ins. Co.*, 245 F.2d 896, 897 (9th Cir. 1957).

Moreover, Red River's proffered concession is directly counter to the position that Red River

and DMLR have taken in the past and are likely to apply in the future.

## I.   Red River is Liable Under the CWA for its Discharges from the Hollow Fill Underdrains.

### A.   The CWA Only Authorizes the Discharge of Pollutants on a Point Source Basis, Not on a Facility Basis.

The CWA prohibits "the discharge of any pollutant by any person" unless done in

compliance with some provision of the Act. § 1311(a). The CWA and Virginia's related state

regulation both define the phrase "discharge of a pollutant" to mean "any addition of any

pollutant to navigable waters *from any point source*." *Id*., § 1362(12) (emphasis added); *see also,*

9 VAC 25-31-10. The CWA defines "point source" as "any discernible, confined, and discrete

conveyance . . . from which pollutants are or may be discharged." *Id.,* § 1362(14); *see also,* 9

VAC 25-31-10. Thus, the CWA "covers the discharge of pollutants on a point source basis."

*Nat'l Wildlife Fed'n v. Consumers Power Co*., 657 F. Supp. 989, 1009 (W.D. Mich. 1987), *rev'd*

*on other grounds*, 862 F.2d 580 (6th Cir. 1988). It does not cover the discharge of pollutants on a

facility basis. "That defendant has secured a permit for certain point source discharges at the

facility thus does not preclude plaintiff from arguing that there are other point source discharges

at the facility for which the Court should also require defendant to secure permits." *Id.*

The provision relevant to this case, § 1342, establishes the National Pollutant Discharge

Elimination System, or "NPDES." The NPDES requires dischargers to obtain permits that place

limits on the type and quantity of pollutants that can be released from point sources into the

Nation's waters. EPA authorized Virginia to issue NPDES permits for the discharge of pollutants

from point sources to waters of the United States on the condition that such discharges will

comply with all applicable CWA requirements. 33 U.S.C. § 1342(a)(1)(A).

EPA regulations provide that to obtain an NPDES permit the discharger must submit an application to the appropriate permitting authority describing the location of each point source or outfall that will discharge pollutants. 40 C.F.R. § 122.21(g)(1) *see also, U.S. v. Avatar Holdings*, 1995 WL 871260 at *9-*11 (M.D. Fl. August 16, 1996) (recognizing that the CWA permit process requires the identification and listing of discharge locations.). EPA regulations make this requirement directly applicable to the NPDES program in authorized States, such as Virginia. 40 C.F.R. § 123.25(a)(4). As a result, the application instructions that control DMLR's issuance of Virginia NPDES permits also require an applicant to describe the location of each outfall that will discharge pollutants. 9 VAC 25-31-100(H)(1).[3] This requirement carries out that statutory directive that permits are issued for specific point sources, not for facilities as a whole.

Further, in order to authorize a point source discharge in a NPDES permit, the regulator must subject that point source to effluent limitations or, at a minimum, monitoring requirements. As the Fifth Circuit has explicitly recognized, "[e]ffluent limitations are to be applied to all point sources of discharge at a facility." *Sierra Club v. Shell Oil Co.*, 817 F.2d 1169, 1173 (5th Cir. 1987); *see also Waterkeeper All., Inc. v. U.S. E.P.A.*, 399 F.3d 486, 491 (2d Cir. 2005) ("the EPA primarily advances the Act's objectives—including the ambitious goal that water pollution be not only reduced, but eliminated, *see* 33 U.S.C. § 1251(a)(1)—through the use of NPDES permits that, while authorizing some water pollution, place important restrictions on the quality and character of that licit pollution").[4]

---

[3] DMLR's authority to issue NPDES permits to coal mining operations in Virginia is conditioned on compliance with all aspects of the Virginia NPDES regulations. 9 VAC 25-31-940(B)(1).

[4] The Ninth Circuit's decision in *Northwest Environmental Advocates v. City of Portland* is not to the contrary. 56 F.3d 979 (9th Cir. 1995). There, the court upheld the district court's decision in favor of the defendant on plaintiffs' unpermitted discharge claim after determining

Courts have found dischargers liable for unauthorized point source discharges even from facilities where certain other point source discharges were authorized by an NPDES permit. In *Legal Environmental Assistance Foundation, Inc. v. Hodel*, the U.S. District Court for the Eastern District of Tennessee found the U.S. Department of Energy to be in violation of the CWA's prohibition against unpermitted discharges where the Department had an NPDES permit that authorized discharges from four point sources but where that permit failed to expressly authorize discharges from an additional four point sources. 586 F. Supp. 1163, 1168–69 (E.D. Tenn. 1984). The court specifically rejected the Department's defense that "because it has a NPDES permit for [the facility], any discharge of pollution from [the facility] is not in violation of the CWA." *Id.* at 1168. In rejecting that argument, the court held that "the position that a NPDES permit for one point source of pollution, allows many other point sources of pollution unless someone appeals the issuance of the permit. . . . is inconsistent with the remedial purpose of the CWA and the requirement that any point source of pollutant discharge be authorized by permit." *Id.* at 1168-69 (citing 40 C.F.R. § 122.1(b)(1)).  Similarly, in *National Wildlife Federation v. Consumers Power Co.*, the court held that permit coverage "for certain point source discharges at the facility" cannot justify or excuse the defendant's "failure to have secured permits for other point source discharges." 657 F. Supp. at 1009.[5] In *U.S. v. Avatar*, the discharger was liable for an unpermitted discharge, despite the fact that there was evidence that

---

that, although the NPDES permit only "expressly cover[ed]" discharges from two outfalls, discharges from 54 additional point sources were also authorized because they were discussed in the permit section titled "permitted activities." *Id.* at 983. In contrast, and as discussed further below, Red River's NPDES permit contains no reference whatsoever to the underdrain point sources.

[5] Although the Sixth Circuit ultimately reversed the district court's determination of liability, it did not address the question of whether NPDES permit coverage for some point sources at a facility precludes liability for additional point sources. *Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988).

the regulator knew about the discharge location.  1995 WL 871260 at *9-*11 (M.D. Fl. August 16, 1996). These decisions all support the principle that NPDES permits are issued on a point source, not a facility, basis.

### B.  Red River's NPDES Permit Does Not Authorize Discharges from its Underdrain Point Sources or Outfalls.

Because the CWA operates on a point source basis, the operative section of a permit in defining authorized discharges is the section listing the point sources or outfalls that can discharge pollutants. In Red River's NPDES permit, that section is the "NPDES outfall description," which contains the "details describ[ing] the treatment facility or source associated with each approved outfall." Doc. 43-7 at 3, 2016 NPDES permit. The table following that statement lists just four outfalls: 001, 002, 006, and 012. *Id.* at 4. The fact sheet supporting that permit lists the same four outfalls. *Id.* at 39.

None of those outfalls are the underdrain outfalls that are the basis of SAMS's claims of unpermitted discharges in this case. In its memorandum in support of its motion to dismiss, Red River admitted that in 2014 "[t]he outfalls associated with the Permit and relevant to this case were deleted." Doc. 12 at 7. Red River also "concedes, for purposes of this motion only, that the discharges from the underdrains at the North Fox Gap Mine come from point sources as defined by the CWA." Doc. 43 at 22. Consequently, discharges from those outfalls are point sources that are no longer authorized by Red River's permit.

Like SAMS, EPA has asserted that discharges from Red River's underdrains are illegal. In September 2016, EPA notified Red River that it was "discharging pollutants from unpermitted point sources into waters of the United States." Ex. 14 at 1, EPA Letter to Red River Coal Company, Sept. 20, 2016.  Table 2 in that letter listed the locations of the unpermitted discharges, and included the same underdrains associated with the outfalls that were deleted by

14

DMLR in 2015 and that are the subject of SAMS's claims in this case. *Id.* at 5. Thus, all of the evidence supports the conclusion that the underdrain discharges are from unpermitted outfalls.

Red River raises several arguments to support its claim that its underdrain discharges are authorized. Each of those arguments fails.

### 1. The reference in the permit's preface to "discharges from the facility" does not mean that the permit authorizes discharges not actually listed in the permit.

Red River first argues that its permit authorizes discharges on a facility-wide basis, and therefore does not need to identify specific point source discharge locations. Doc. 43 at 16-17. Red River relies on a statement in the opening paragraph of the permit that it "is authorized to discharge from the facility listed below." Doc. 43-7 at 1, 2016 NPDES permit. Red River's reliance on the reference to "the facility" in that prefatory paragraph runs afoul of two principles of statutory construction.[6]

The reference to "the facility" in the permit's opening paragraph cannot be read as controlling the later more specific provisions contained in the body of the permit because "[u]nder settled rules of construction, if the prefatory or recital language conflicts with the obligatory provisions of the contract, then the obligatory provisions must prevail." *United Virginia Bank/Nat'l v. Best*, 223 Va. 112, 114, 286 S.E.2d 221, 223 (1982). The introductory paragraph in the permit is merely descriptive, whereas the body of the permit imposes the obligatory and operative effluent limitations and monitoring requirements. Specifically, Section A of the permit—"Permit Requirements"—lists "effluent limitation and monitoring requirements" for only the four authorized outfalls. Doc. 43-7 at 4.

---

[6] The similar language from the original 1992 permit—"discharge from a facility"—is also found in that permit's prefatory paragraph. Doc. 43-3 at 2.

Further, Red River's reliance on the "facility" reference in the permit's opening paragraph is contrary to the rule articulated by the U.S. Supreme Court that "contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." *Walsh v. Schlecht,* 429 U.S. 401, 408 (1977). As discussed above, the CWA operates on a point source basis. Accordingly, Red River's interpretation of the permit in a way that "does not limit authorized discharges from the facility to specific locations or outfalls" (Doc. 43 at 17) should be rejected, because it would render the permit illegal and unenforceable.

Other portions of the NPDES permit confirm that only discharges from the four listed outfalls are authorized. Where, as here, DMLR issues a permit for point source discharges into an impaired water that is subject to a Total Maximum Daily Load (TMDL), it must allocate the permissible contribution from that permit to that TMDL. *See Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 294 (D.C. Cir. 1981) (TMDLs are "allocated by insertion into NPDES permits, among the various point source dischargers upon the stream segment"). The South Fork Pound River is impaired for TDS and subject to a TMDL for that pollutant. As described in SAMS's First Amended Complaint, underdrains 1 through 6 continue to discharge very high levels of TDS into the South Fork Pound River. *See* Amended Complaint at ¶¶ 62-65 and App. A. Red River does not dispute these monitoring results. *See* Doc. 43 at 9, ¶ 20. If the discharges from the hollow fill underdrains were authorized by the permit, then Red River would have had to report—and DMLR would have had to account for— TDS discharges greater than zero for purposes of TMDL monitoring. But the 2016 NPDES permit fact sheet lists no contribution of TDS from the entire permit. Doc. 43-7 at 46 (allocating 0.00 TDS for Red River's permit number 1101401); *id.* at 48 ("As the discharges from this permit rarely discharge and the waste load contributed to the

16

South Fork Pound River Watershed through NPDES discharges from this permit is less than 1% of the total mining waste load, no offsets were necessary for this permit."). This shows that discharges of TDS from the underdrains are not accounted for, and therefore not actually covered by, the NPDES permit.

Finally, the term "discharge" is a term of art under both the CWA and Virginia's related state regulations and is specifically defined in each act. The CWA and the state regulation specifically define both "discharge of a pollutant" and the unqualified use of the term "discharge" to mean "discharges from a point source." 33 U.S.C. § 1362; 9 VAC-25-31-10. The authorization cannot be for the entire facility because the facility as a whole is not a "point source" as defined within those statutes. Under no conceivable characterization can Red River's entire 694-acre facility be considered a "discernible, confined, and discrete conveyance." *See* 33 U.S.C. § 1362(14) (defining "point source" to be a discernible, confined, and discrete conveyance); 9 VAC-25-31-10 (same). The alternative interpretation of the permit—that only those point sources expressly referenced in the permit are authorized—maintains the validity of the enforceability of the permit and therefore must be adopted.

## 2. The permit prohibits discharges from point sources not listed in the permit.

Red River argues that the permit's identification of specific outfall locations is not exclusive, because the permit does not contain a condition providing that only discharges from listed outfalls are authorized. Doc. 43 at 17-18. In fact, it does. Condition II.F provides that "[e]xcept in compliance with this permit," "it shall be unlawful for any person to ... [d]ischarge into state waters sewage, industrial wastes, other wastes, or any noxious or deleterious substances." Doc. 43-7 at 17. The Fourth Circuit recently interpreted this very same condition in *Sierra Club v. Virginia Elec. & Power Co.*, 903 F.3d 403 (4th Cir. 2018), stating that:

> In the context of the Clean Water Act, the phrase "discharge into state waters" has a particular meaning, and the VDEQ regulations recognize this, defining "discharge" to mean the addition of pollutants "from any *point source*." 9 Va. Admin. Code § 25-31-10 (emphasis added). *Condition II.F thus operates as the Commonwealth's counterpart to the permit's* <u>*expressly authorized*</u> *discharges, reiterating 33 U.S.C. § 1311(a)'s prohibition against discharges from a point source not otherwise authorized by permit.*

*Id.* at 413-14 (emphasis added). This permit condition is necessary to comply with EPA regulations. Those regulations provide that "the State program must prohibit all point source discharges of pollutants, . . . entering into any waters of the United States within the State's jurisdiction except as authorized by a permit in effect under the State program or under section 402 of CWA." 40 C.F.R. § 123.1(g)(1). Thus, in the absence of an affirmative and express permit authorization for discharges from a specified point source, discharges from that point source are prohibited.

### 3. Monitoring at the underdrains is required only by SMCRA and not by the NPDES permit.

Third, Red River argues that its permit imposes monitoring requirements for the underdrains, and those requirements mean that DMLR specifically authorized discharges from those underdrains. Doc. 43 at 17-18. However, monitoring at the underdrains is not part of the NPDES permit. It is included only in the SMCRA portion of the combined NPDES/SMCRA permit. The current NPDES permit and its supporting fact sheet contain no listing or description of the underdrain monitoring points or any other groundwater monitoring. Doc. 43-7. Similarly, the original 1992 NPDES permit contains no listing or description of underdrain monitoring points. Doc. 43-3 at pp. 6-18. The groundwater monitoring reporting forms for the underdrains included as part of Red River's 1992 NPDES permit exhibit (Doc. 43-3 at 21-33) do not reference any NPDES monitoring requirements. Those reporting forms can best be understood as facilitating the groundwater monitoring that is required solely under SMCRA. *See* 4 VAC 25-

130-817.41(c) (Virginia SMCRA regulations requiring groundwater monitoring). This absence

of reference to the underdrains in the NPDES permit is not surprising, as NPDES permits in

Virginia do not address groundwater pollution, but instead authorize only discharges from point

sources into navigable waters. *See Virginia Elec. & Power Co.*, 903 F.3d at 413 ("VDEQ made

clear that it did not consider the Clean Water Act discharge permits to cover groundwater

contamination and that they only covered discharges from point sources into navigable waters, as

stated in the Clean Water Act.").[7]

4. **The Monitoring Point Detail Summary materially changed the terms of the NPDES permit by eliminating any effluent limitations or CWA monitoring requirements for the hollow fill underdrains.**

Red River is wrong when it argues that the February 26, 2015 Monitoring Point Detail

Summary "did not change any other term or condition of the Permit, and it did not alter the scope

of discharges authorized under the Permit." Doc. 43 at 16. In fact, by deleting the monitoring

points associated with the sedimentation ponds, the Monitoring Point Detail Summary

fundamentally altered the NPDES permit because it removed any permit authorization for

discharges originating from the hollow fills and associated underdrains. Prior to their removal,

the sediment ponds had collected the discharges from the six hollow fills that are the subject of

this action. Ex. 1 (2016 OSM Hydrologic Investigation) at SAMS00667. Surface water

discharges from the hollow fills therefore only reached jurisdictional streams after passing

through authorized NPDES outfalls. *Id*. Following removal of those ponds and outfalls, the

hollow fills and associated underdrains now discharge directly to unnamed tributaries of the

South Fork Pound River and Rat Creek. But the NPDES permit currently lacks any reference

_____

[7] The downgradient points where water flowing through the underdrains reaches the surface and is discharged to surface streams *do* fall within the Clean Water Act's jurisdiction. Those surface discharges are what were formerly authorized prior to pond removal and the deletion of the NPDES outfalls.

to—let alone authorization for—any point source associated with the hollow fills or underdrains. *See* Doc. 43-7. The four remaining monitoring points identified in the NPDES permit and subject to effluent limitations are all associated with ponds that are located above the hollow fills and that do not discharge. Ex. 1 at 8, 2016 OSM Hydrologic Investigation; Doc. 43-7 at 48.

### 5. At the time the current NPDES permit was issued, both Red River and DMLR believed that discharges from the hollow fill underdrains were exempt from permit coverage.

Finally, Red River is wrong when it asserts that this Court may not consider extrinsic evidence when interpreting the NPDES permit. *See* Doc. 43 at 15, 17. Even if the Court disagrees with SAMS's interpretation—that the language "to discharge from the facility" cannot be reasonably interpreted to be a facility-wide authorization—the language is, at best, ambiguous. In such a situation, the use of extrinsic evidence is appropriate. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD*, 268 F.3d 255, 270 (4th Cir. 2001) (where permit language is ambiguous, court "must look to extrinsic evidence to determine the correct understanding of the permit"). Here, it is clear that neither DMLR nor Red River (nor the relevant federal regulators) considered the discharges from underdrains 1-6 to be covered by the 2016 NPDES permit when that permit renewal was issued.

In its January 28, 2016 objection to the NPDES permit renewal, EPA stated, "[i]t is our understanding that this facility continues discharging TDS from the original outfall locations. As set forth above, that ongoing discharge from the original outfall locations needs a permit, regardless of whether the discharges are deemed to be associated with active mining activity."

Ex. 10. This statement would be nonsensical if EPA believed that the underdrains were part of the permit.[8]

Red River's response to EPA's objection shows that the company did not believe the underdrains were covered either. In a March 2016 letter to DMLR regarding the EPA objection, Red River—through counsel—explained,

> EPA's allegations reflect a fundamental misunderstanding of the facts. Where a sediment control pond has been removed, reclaimed, and re-vegetated as part of post-mining reclamation and bond release, *the physical "point source" conveyance is removed and thus drops out of the NPDES program.* Any underdrain that was constructed in connection with a hollow fill and that remains post-reclamation and/or post-bond-release serves only to convey groundwater flow, which is regulated – if at all – under the SMCRA program, not the NPDES program.

Ex. 11 at 4 (emphasis added).[9]

Until this litigation, DMLR had the same view, that the underdrains were *exempt* from the permit, not covered by it. In its response to the EPA objections that the "original outfalls" should be regulated under the NPDES permit, DMLR explained its position that "[n]o constructed discharges or siltation structures exist at the original discharge locations. The areas

---

[8] EPA did not change its mind or withdraw the objection. On September 20, 2016, the agency issued a "show cause" letter explaining that discharges from hollow fill underdrains constituted unpermitted discharges. Ex. 14. EPA correspondence from November 17, 2016, explained that EPA did not consider the permit to be validly issued, because the objection had not been resolved at the time of the permit issuance. Ex. 13 at 1. The letter demonstrates that EPA continued to believe that hollow fill discharges were not covered by the NPDES permit: "To the extent there are post-bond release discharges, then those must be regulated through an NPDES permit under sections 301(a) and 402 of the CWA." *id.*

[9] Red River maintained this view after the issuance of the permit. In response to EPA's show-cause letter for unpermitted discharges from the underdrains Red River stated, "… we trust you are aware that under the approved and delegated NPDES permit program for Virginia's coalfields, NPDES permit coverage is retired after sediment ponds are removed. Underdrains are regulated through the SMCRA permit, not the NPDES permit." Ex. 16 at 1, Red River Letter to EPA, Sept. 30, 2016.

have been reclaimed and streams restored per the joint permit requirements." Ex. 12, April 8, 2016, DMLR Letter. That letter further makes clear that DMLR did not consider there to be any ongoing NPDES monitoring at the underdrains themselves. After referencing "water quality information representative of those [pond] locations," DMLR described only ongoing aquatic life and water quality sampling in "Rat Creek and the South Fork Pound River." *Id*.

DMLR more fully explained its view elsewhere. In response to Sierra Club comments on the failure to require permit coverage of hollow fills on a different permit, the agency stated,

> DMLR does not require discharges from underdrains on appropriately reclaimed mined lands to be NPDES outfalls. DMLR, VA DEQ, and EPA have not historically classified reclaimed coal mine fill underdrains in Virginia as point source discharges in need of a DLMR issued NPDES permit . . . Virginia's VDPES regulations provide specific exemption from storm water discharges from pastures and forest lands at 9VAC25-31-40.[10]

Ex. 17 at 2-3, DMLR May 2, 2017 Response to Comments.  In a memorandum to OSM on the matter, DMLR explained,

> DMLR does not permit reclaimed underdrains as outfalls because they are constructed beneath fills to transport naturally occurring groundwater and because areas reclaimed on the surface of hollow fills as pasture are exempt from NPDES permits. Virginia's VPDES regulations provide specific exemption for storm water discharges from pastures and forest lands at 9VAC25-31-40.

Ex. 18 at 1, DMLR, "Response to OSM's Recent Decision to Conduct a Federal Inspection at Red River Coal Company PNs 1101401, 1101760, and 1100044," August 19, 2016.

The DMLR guidance documents on post-reclamation pond removal and NPDES point deletion cited by Red River (Doc. 43 at 20) also confirm that DMLR took the view that no NPDES coverage is required for hollow fill underdrains following reclamation. *See* Docs. 43-10 and 43-11. DMLR Procedure No. 3.3.16, regarding Sediment Pond Effluent Limits/Removal

---

[10] The response to comments came as part of the permitting process for a different mine in the same watershed, and dates from May 2, 2017, after the North Fox Gap Surface Mine 2016 NPDES permit renewal had been issued.

states that pond removal "eliminat[es] the NPDES monitoring point," and that once "a sediment pond is removed . . . the NPDES discharge point is eliminated." Doc. 43-10. Nothing in the DMLR Guidance Memorandum for Potential Problem Discharges contradicts this understanding. Doc. 43-11. Rather than support Red River's argument that the 2016 NPDES permit renewal authorizes discharges from the hollow fill underdrains, the DMLR guidance documents confirm that DMLR took the position that hollow fill underdrains are excluded from NPDES permit coverage.[11]

While EPA disagreed with DMLR and Red River about whether permit coverage was *necessary*, none of the parties involved with the issuance of the permit believed that the hollow fill underdrains were *actually* covered by the permit. The expansive view of the scope of permit coverage espoused in Red River's motion for summary judgment is therefore contrary to the basic tenets of NPDES permitting, the language of the CWA and Virginia regulations, and the views of all parties to the permit at the time of its issuance.

Red River relies heavily on statements made by DMLR employee Rodney Baker in a 30(b)(6) deposition to support its view of permit coverage. Those statements, however, were largely limited to flat agreements with Red River's counsel without explanation or rationale. Doc. 43 at 7-14. Mr. Baker's testimony directly conflicts with DMLR's opinion and rationale about the scope of permit coverage expressed in agency correspondence in response to inquiries

---

[11] Red River's assertion that DMLR fully complied with its own guidance documents when it authorized removal of the ponds and deletion of the NPDES points is also wrong. Doc. 43 at 20. The DMLR Guidance Memorandum for Potential Problem Discharges requires the agency to determine whether "applicable receiving stream standards [are] being violated." Doc. 43-11 at 2. The applicable standards include both numeric and narrative standards. Ex. 3, Baker Deposition, at 209-10. Red River has only documented, however, that DMLR considered *numeric* standards. *See* Doc. 43 at 20, 13 ¶41 (referencing statement from Baker deposition that "review of the available data did not indicate that the underdrain discharges above locations where ponds have been removed and reclaimed have the potential for violation of Virginia's *numeric* stream standards") (Doc. 43-2 at 110) (emphasis added).

by federal regulators and comments on permits it issued, as discussed above. *Supra,* 7-9, 20-23. As this Court stated in its prior decision in this case, "[d]eference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." Doc. 31 at 19 (internal citations omitted). Because the position of Mr. Baker is devoid of agency rationale, conflicts with the expressed view of the agency at the time the permit was issued, and directly opposes the views of EPA and the permitting structure of the CWA, it is not due any deference.

### C. Red River Does Not Have a Permit Shield Defense for Its Unpermitted Discharges from Outfalls that Are Not Specified in Its Permit.

The holder of an NPDES permit alleged to be in violation of the CWA may in certain circumstances invoke the "permit shield" defense of CWA section 402(k), which states as pertinent:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title . . . .

33 U.S.C. § 1342(k); *see also* 40 C.F.R. § 122.5. An April 1995 EPA guidance document ("1995 Guidance") explains the scope and proper application of the permit shield. Ex. 19, EPA "Revised Policy on Scope of Discharge Authorization and Shield Associated with NPDES Permits." The 1995 Guidance states an individual permit provides "authorization and therefore a shield for the following pollutants resulting from facility processes, waste streams and operations that have been clearly identified in the permit application process *where discharged from specified outfalls.*" *Id.* (emphasis added).

EPA thus recognizes that, in certain circumstances, pollutants not expressly addressed in an NPDES permit may nevertheless be within the scope of that permit's shield. However, in order to qualify for this defense, the unspecified pollutants must still be discharged from

"specified outfalls." Like the permit requirement, the permit shield defense only applies to discharges from specific point sources identified in the permit. Red River fails to satisfy this prerequisite for the permit shield defense. Its discharges are from point sources that are not identified as specified outfalls in its permit.

Red River cites no case that has applied the permit shield to discharges from unlisted and unpermitted point sources. The only cases it cites are *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 285 (6th Cir. 2015), and *Piney Run Pres. Ass'n v. Cnty. Com'rs*, 268 F.3d 255, 269 (4th Cir. 2001). Both of those cases addressed the limited issue of whether a discharger was shielded when it discharged *pollutants* that were not listed in its permit. But they did not address the issue presented here, which is whether a discharger is shielded when it discharges *from an additional point source* that is not identified and specified as an outfall in its permit. On that point, the 1995 Guidance clearly says no.

The U.S. District Court for the Western District of Michigan, in the *Consumers Power* decision discussed above, explicitly held that the permit shield is *not* available to a defendant where that defendant has a NPDES permit for some point sources but not for others. 657 F. Supp. at 1009-10. The court fully considered defendant's argument that the permit shield should apply because the regulator was familiar with the facility and its operations and thus defendants' "activities have not taken place surreptitiously." *Id*. But the court rejected that argument, stating "I fail to see the relevance of the lack of secrecy regarding defendant's activities. Defendant simply does not have a permit authorizing it to discharge [pollutants] in its turbine generating water at the facility, and therefore cannot claim the protection of section 402(k)." *Id*.[12]

---

[12] The Sixth Circuit did not address the availability of the permit shield when it reversed the district court's determination of liability for other reasons. *Consumers Power Co.*, 862 F.2d 580.

This conclusion is consistent with numerous decisions holding that citizen plaintiffs are not precluded from bringing an enforcement action for unpermitted discharges from point sources, even if EPA or the state has determined that the discharge is not from a point source and no permit is required. The Ninth Circuit has repeatedly held "that a court may, in entertaining a citizen suit, decide whether a discharge of particular matter into navigable waters violates the CWA even though the regulating agency determined that the discharge was not subject to the requirement of a permit." *San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007) (*citing Association to Protect Hammersley, Eld, and Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1012-13 (9th Cir. 2002)). The Fifth Circuit has similarly stated that "a citizen may . . . bring an action against a person that is [acting] without a permit even where [the] EPA has failed to issue a permit or promulgate an effluent limitation to cover the discharge." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 566 (5th Cir. 1996). *See also W. Virginia Highlands Conservancy, Inc. v. Huffman*, 651 F. Supp. 2d 512, 518 (S.D.W. Va. 2009); *Soundkeeper, Inc. v. A & B Auto Salvage, Inc.*, 19 F. Supp. 3d 426, 434 (D. Conn. 2014); *Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*, CIV. A. 3:14-11333, 2015 WL 2144905, at *9 (S.D.W. Va. May 7, 2015). A state "has no authority to create a permit exemption from the CWA for discharges that would otherwise be subject to the NPDES permitting process." *N. Plains Res. Council v. Fid. Expl. & Dev. Co.,* 325 F.3d 1155, 1164 (9th Cir. 2003). It follows that a state cannot create a permit shield or immunize a polluter by deciding that its discharges are not from a point source and do not need to be identified as coming from a specific listed outfall in a permit.

The permit shield applies to questions of the sufficiency of effluent limitations but does not apply to questions of whether a discharge originates from a point source because the former

requires application of agency expertise while the latter falls within the competence of the courts.

Courts have contrasted the relatively straightforward legal determination of whether a discharge

originates from a point source with the more technical considerations inherent in setting effluent

limitations in an NPDES permit. *See U.S. Pub. Interest Research Grp. v. Heritage Salmon, Inc.*,

No. CIV.00-150-B-C, 2002 WL 240440, at *16 (D. Me. Feb. 19, 2002) ("This is not a case

where the court is asked to determine issues that clearly implicate the special expertise and

competence of the EPA, such as the appropriate level and quality of discharges, the effect of a

discharge on water quality, or whether a drainage endangers human health."). This is because the

question of whether an unauthorized discharge from a point source to navigable waters has

occurred is "not so suffused by technical and policy considerations" that a court must defer to the

expertise of a regulator. *See Residents Against Indus. Landfill Expansion (R.A.I.L.E.) v.

Diversified Sys., Inc.*, 804 F. Supp. 1036, 1037–38 (E.D. Tenn. 1992) (internal quotations

omitted).

## II.   Even if Red River's Discharges Were Protected by the CWA's Permit Shield, Those Discharges Violate SMCRA.

SAMS's SMCRA claim provides an alternative basis for enforcing Red River's

violations of water quality standards. Virginia's federally-approved SMCRA program requires

SMCRA permittees to comply with state water quality standards and to construct and operate

adequate treatment facilities to ensure such compliance. 4 VAC 25-130-816.42. SAMS can

enforce that performance standard against SMCRA permittees. *Molinary v. Powell Mountain

Coal Co.,* 125 F.3d 231, 236-37 (4th Cir. 1997).

Red River argues that if this Court dismisses SAMS's CWA claim because of Red

River's permit shield defense, then SAMS cannot prevail on its SMCRA claim either because of

SMCRA's savings clause. Doc. 43 at 21. SMCRA's savings clause provides, in relevant part,

that "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing" the CWA. 30 U.S.C. § 1292(a). Red River argues that if it is shielded from CWA liability, then it cannot be found liable under SMCRA without violating that clause. The savings clause does not prohibit SAMS's SMCRA claim, however, because (1) the Court lacks jurisdiction to consider Red River's collateral attack on the SMCRA standard, and (2) Virginia's SMCRA program is consistent with the CWA.

### A. The Court Lacks Jurisdiction to Consider Red River's Untimely Collateral Attack on the SMCRA Standard.

Red River cannot invoke the SMCRA savings clause as a defense to its violation of the SMCRA performance standard because Red River's challenge is too late and filed in the wrong court. In effect, Red River claims that the SMCRA standard is unenforceable because it is inconsistent with the CWA. That is an untimely collateral attack on the standard. OSM and EPA rejected Red River's argument thirty years ago in 1982 when they approved the federal SMCRA performance standard requiring compliance with water quality standards. 30 C.F.R. § 816.42, *approved at* 47 Fed. Reg. 47,216 (Oct. 22, 1982). Virginia's standard is identical to the federal standard. 4 VAC 25-130-816.42. OSM stated that its rule provides "that discharges must comply with all State and Federal water quality laws and regulations. This includes applicable water quality standards." *Id*. at 47,220. OSM specifically found that this standard was "consistent with the Court of Appeals ruling [in *In re: Surface Mining Regulation Litigation*, 627 F.2d 1346, 1367 (D.C. Cir. 1980)] and will help eliminate unnecessary duplication and confusion between EPA's and OSM's standards." *Id*. at 47,217. EPA concurred that this standard was consistent with the CWA. *Id*. at 47221; *see* 30 U.S.C. § 1251(a)(B) (requiring EPA concurrence in OSM regulations).

Challenges to OSM actions approving a national rule or approving Virginia's SMCRA program are subject to judicial review <u>only</u> in the U.S. Court of Appeals for the D.C. Circuit or the Fourth Circuit, respectively, and must be filed within 60 days. 30 U.S.C. § 1276(a)(1).  Red River's challenge is over thirty years too late and has been brought in the wrong court.

### B.  Virginia's SMCRA Standard Is Consistent with the CWA.

Even if this Court has jurisdiction to consider its challenge, Red River is wrong that Virginia's SMCRA performance standard conflicts with the CWA. The CWA requires dischargers to comply with "any more stringent limitation, including those necessary to comply with water quality standards . . . established pursuant to any State law or regulations." 33 U.S.C. § 1311(b)(1)(C). Virginia's SMCRA performance standard falls squarely within the scope of this section. It is a limitation requiring compliance with water quality standards and is "established pursuant to a[] State law or regulation," namely 4 VAC 25-130-816.42. Section 1311(b)(1)(C) mandates compliance with "any" state regulations that require compliance with water quality standards.  Section 25-130-816.42 is such a regulation. This conclusion is sufficient by itself to support the viability of SAMS's SMCRA claim.

In addition, the CWA and SMCRA each provide that States cannot enforce regulations under their delegated state programs that are inconsistent with, or less stringent than, federal requirements. 33 U.S.C. § 1370; 30 U.S.C. § 1255(b). More stringent state laws and standards are permissible. *See Penn. Coal Mining Ass'n v. Watt*, 562 F. Supp. 741, 746-47 (M.D. Pa. 1983). This statutory framework has two consequences that negate Red River's argument.

First, the federal SMCRA rule requires compliance with water quality standards. 30 C.F.R. § 816.42. In promulgating that rule, OSM stated that "Congress intended that surface coal mining and reclamation operations should not proceed unless all applicable water quality standards are achieved and maintained." 44 Fed. Reg. 14,902, 14,927 (Mar. 13, 1979). Thus,

water quality standards provide the "floor" for compliance with SMCRA. If Red River's argument were correct, Red River could use SMCRA's savings clause to allow Virginia's SMCRA program to fall through the floor, which 30 U.S.C. § 1255(b) prohibits.

Second, Red River is essentially arguing that the SMCRA performance standard is more stringent than what the CWA requires. But both the CWA and SMCRA allow states to enact more stringent state requirements. When those requirements are approved by federal regulators as part of delegated state programs under the CWA and SMCRA, they are incorporated into federal law and become federally enforceable by EPA and citizens. *U.S. v. Smithfield Foods, Inc.*, 191 F.3d 516, 526 (4th Cir. 1999) ("EPA has the authority to enforce these more stringent state effluent standards once they are incorporated into a polluter's permit"); *Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1006-08 & n. 15 (11th Cir. 2004) (citizens can enforce more stringent state conditions in CWA permits). If Red River's argument were correct, Red River could use the CWA's permit shield and SMCRA's savings clause to nullify the more stringent SMCRA rule.

OSM—the federal agency tasked with overseeing the mining program in Virginia—has endorsed the view that water quality standards are enforceable against discharges from the hollow fill underdrains at the North Fox Gap Surface Mine. In a letter to DMLR regarding a citizen complaint about the removal of ponds from the NPDES permit, OSM stated, through its Regional Director, that "[r]emoval of ponds does not negate the obligations for compliance with water quality standards. The regulation at 4VAC25-130-816.42 provides that all discharges of areas disturbed by surface mining activities must be made in compliance with all applicable State and Federal water quality laws, standards and regulations . . . ." Ex. 15 at 6, Dec. 15, 2015 OSM Letter. In support of this interpretation, OSM quoted from the preamble to the parallel federal

regulation: "OSM agrees that mining operations should not be allowed to cause violations of the water quality standards of the downstream receiving waters. The general requirements for protection of the hydrologic balance of Secs. 816.42 and 817.42 clearly include such prohibition. (47 FR 47216, October 22, 1982)". *Id.* OSM summarized its interpretation of the preamble as follows: "*The preamble is clear on the operator's obligation to assure water quality standards are met.* If water that is not in compliance with the permit conditions or the approved program is leaving the site, the DMLR is obligated to require treatment." *Id.*

According to Red River, SMCRA's savings clause overrides the substantive SMCRA provision that allows the more stringent SMCRA rule. Supreme Court precedent prohibits this result. The Court has held that when there is a statutory conflict between a substantive provision and a savings clause in a statute, the substantive provision controls. *U.S. v. Locke*, 529 U.S. 89, 106 (2000) ("We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law"). Since Virginia's rule is authorized by SMCRA, it cannot be prohibited by the savings clause. That result preserves two careful regulatory schemes that both mandate compliance with water quality standards. If Red River's argument were accepted, however, the savings clause would be given a broad effect that would impermissibly override the statutory provision allowing more stringent state laws. In doing so, it would also mean that water quality standards would not be enforceable under either the CWA or SMCRA. That would be a perverse result. The savings clause cannot be used in that way to override the substantive provisions of a statute and "defeat its own objectives." *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 872 (2000). Red River's interpretation would not "save" the CWA or SMCRA, but instead would destroy them. In construing a savings clause, a statute

31

"cannot be held to destroy itself." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998).[13]

### III.    Red River Is Not Entitled to Summary Judgment on SAMS's Alternative RCRA Claim.

SAMS will pursue its alternative RCRA claim only if it is established that Red River's underdrains are not point sources. In that event, the discharges are not subject to the CWA and become subject to RCRA. *See* 42 U.S.C. § 6903(27) (RCRA solid wastes include "discarded material, including . . . liquid . . . material resulting from . . . mining . . . operations," but not "industrial discharges which are point sources" subject to CWA § 402 permits.). Red River cannot obtain summary judgment on the RCRA claim by conceding, "for the purposes of this motion only," that its underdrain discharges are from point sources. Doc. 43 at 22. This is particularly true as both Red River and DMLR have previously taken the position that the hollow fill underdrains are not point sources and are exempt from NPDES permit coverage, and have made no indication that they intend to diverge from that position in the future.

A conditional "concession" of fact is insufficient to support summary judgment. "A concession of fact on motion for summary judgment establishes the fact for all time between the parties. The party cannot gamble on such a conditional admission and take advantage thereof when judgment has gone against him." *Franklin Life Ins. Co.*, 245 F.2d at 897.

In any event, this Court has complete discretion in determining whether to grant or deny motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

---

[13] Red River cites the Sixth Circuit's holding in *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 291-92 (6th Cir. 2015), that the SMCRA savings clause barred enforcement of water quality standards under SMCRA when the applicable CWA general permit did not contain a narrative condition requiring compliance with those standards. The court's holding hinged on its finding that "the CWA regulatory framework controls over inconsistent regulation under the Surface Mining Act." *Id.* As we have shown, the CWA and SMCRA are not inconsistent. Both require compliance with water quality standards. Furthermore, *ICG* is inconsistent with Supreme Court precedent on the effect of a savings clause on substantive statutory provisions.

*Andrew v. Clark*, 561 F.3d 261, 271 (4th Cir. 2009). The Court may exercise this discretion and deny a motion for summary judgment "even when the standard appears to have been met." *Id.* (citations omitted). The Court should exercise its discretion and deny Red River's motion because—even if Red River's conditional concession were valid—a finding for the defendant on the RCRA claim on the basis of that concession would only prolong the dispute between the parties and waste judicial resources.

If the Court grants Red River's motion as to the CWA claims on the basis of Red River's argument that the hollow fill underdrains are point sources that are authorized under the NPDES permit, then the RCRA exemption will also apply and there will be no RCRA liability. If, however, the Court denies Red River's motion as to the CWA claims, then the question of whether the hollow fill underdrains are point sources (and thus require NPDES permit coverage) will remain unresolved. In that event, the Court will be asked—either at trial or in a separate summary judgment motion—to resolve the point source issue. And if the Court determines at that time that the underdrains are not point sources, then SAMS must be given an opportunity to establish the remaining elements in its RCRA claim.

The situation to be avoided in the interest of judicial economy is precisely the situation presented in Red River's RCRA argument: a determination that Red River is not liable under the CWA based on the Court's interpretation of the NPDES permit (without resolving the point source question), and a determination that Red River is not liable under RCRA based solely on Red River's conditional concession. Because the Court's acceptance of Red River's conditional concession will not be binding on any of the parties outside of the present motion, Red River and DMLR will be free to revert to their prior interpretation that the hollow fill underdrains are not point sources. Such a position would mean that Red River would once again be subject to a

RCRA enforcement suit. *See W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1061 (N.D. Cal. 1998), *aff'd,* 190 F.3d 974 (9th Cir. 1999) ("[f]acts established by stipulations or concessions *arguendo,* rather than by judicial resolution, are not fully litigated and do not have collateral estoppel effect.") Rather than set the stage for another round of litigation between the parties, the Court should allow all of SAMS's claims to be resolved via the present suit.

As evidenced by the correspondence discussed above, both Red River and DMLR have made clear that they do not believe the discharges from the hollow fills and underdrains are point source discharges subject to section 402 of the CWA. It is also undisputed that Red River continues to discharge pollutants, including TDS and conductivity, from the hollow fill underdrains. *See* Doc. 43 at 9, ¶ 20 (conceding that SAMS' Amended Complaint accurately lists the levels of TDS discharges). Prior to the present motion, both Red River and DMLR took the position that the discharges from the hollow fills and underdrains are *exempt* from NPDES permit coverage. In the March 2016 letter from Red River's counsel to DMLR, Red River stated that "[a]ny underdrain that was constructed in connection with a hollow fill and that remains post-reclamation and/or post-bond-release serves only to convey groundwater flow, which is regulated - if at all - under the SMCRA program, not the NPDES permit program." Ex. 11, Letter from Red River to DMLR. Similarly, in both the August 2016 memo and a May 2017 official response to citizen comments, DMLR stated "DMLR does not require discharges from underdrains on [appropriately] reclaimed mined lands to be NPDES outfalls. . . . DMLR does not permit reclaimed underdrains as outfalls because they are constructed beneath fills to transport naturally occurring groundwater and because areas reclaimed on the surface of hollow fills as pasture or unmanaged forest lands are exempt from NPDES permits." Ex. 18 at 1, DMLR

Memorandum, August 19, 2016; Ex. 17 at 2, DMLR Response to Comments. Red River has not offered any evidence indicating that either it or DMLR actually now believes that the hollow fills and underdrains are point sources.

Red River cannot have it both ways. SAMS has shown that Red River is not entitled to summary judgment on SAMS's CWA claim. If that motion were denied, the condition supporting Red River's concession would no longer be met, and it would therefore remain uncertain whether the CWA or RCRA applies. Red River has presented no undisputed facts on which the Court could make a ruling on whether the underdrains are point sources. Thus, the Court has no basis at this time to rule on the RCRA claim.

## CONCLUSION

For all of these reasons, SAMS respectfully requests that this Court deny Red River's Motion for Summary Judgment in full.

Respectfully submitted this 2nd day of November, 2018.

/s/ Peter M. Morgan
Peter M. Morgan (admitted *pro hac vice*)
1536 Wynkoop St., Ste 200
Denver, CO 80202
(303) 454-3367
peter.morgan@sierraclub.org

J. Michael Becher (admitted *pro hac vice*)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-382-4798 (voice)
304-793-9008 (facsimile)
mbecher@appalmad.org

Evan D. Johns (VA Bar No. 89285)
Appalachian Mountain Advocates
415 Seventh Street Northeast

Charlottesville, Virginia 22902
(434) 529-6787
ejohns@appalmad.org

*Counsel for Southern Appalachian Mountain
Stewards, Appalachian Voices, and Sierra Club*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of November, 2018, I electronically filed the

foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR

SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF System, which will send

notification of such filing to the users registered on the system.

/s/ Peter M. Morgan
Peter M. Morgan (admitted *pro hac vice*)
1536 Wynkoop St., Ste 312
Denver, CO 80202
(303) 454-3367
peter.morgan@sierraclub.org

*Counsel for Southern Appalachian*
*Mountain Stewards, Appalachian Voices,*
*and Sierra Club*