# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SOUTHERN APPALACHIAN MOUNTAIN STEWARDS, ET AL.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:17CV00028 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **RED RIVER COAL COMPANY, INC.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Peter M. Morgan, Denver, Colorado, Evan D. Johns, Appalachian Mountain Advocates, Charlottesville, Virginia, and J. Michael Becher, Appalachian Mountain Advocates, Lewisburg, West Virginia, for Southern Appalachian Mountain Stewards, Appalachian Voices, and Sierra Club; Brooks M. Smith and Dabney J. Carr, IV, Troutman Sanders LLP, Richmond, Virginia, for Red River Coal Company, Inc.*

In this environmental case, Southern Appalachian Mountain Stewards, Appalachian Voices, and The Sierra Club (collectively, "SAMS") have sued Red River Coal Company, Inc. ("Red River") for allegedly violating the Clean Water Act ("CWA"), the Surface Mining Control and Reclamation Act ("SMCRA"), and, in the alternative, the Resource Conservation and Recovery Act ("RCRA"), by discharging pollutants without permit authority. Red River has filed a related declaratory judgment action, Case No. 2:17CV00021, seeking a declaration that it is not violating the CWA and SMCRA, but the motions at bar have been filed solely in this case.

After conducting discovery, Red River has moved for summary judgment on SAMS's claims for relief. SAMS has moved for partial summary judgment on the issue of its standing. The motions have been fully briefed and orally argued and are ripe for decision. For the reasons that follow, I will grant SAMS's Motion for Partial Summary Judgment and will grant Red River's Motion for Summary Judgment.

I.

The relevant facts are largely uncontested. The following facts taken from the summary judgment record are either undisputed or, where disputed, are presented in the light most favorable to the nonmoving party.

Red River operates a surface coal mine in this judicial district called the North Fox Gap Surface Mine ("Mine"). The Mine discharges pollutants into the South Fork Pound River, Rat Creek, Stillhouse Branch, and other unnamed tributaries. Some of the discharges are governed by effluent limits in the Mine's combined SMCRA and National Pollution Discharge Elimination System ("NPDES") permit. The discharges include substances that contribute to total dissolved solids ("TDS") and conductivity. Virginia has classified the South Fork of the Pound River as biologically impaired due to its high level of TDS.

The area in which the Mine is located was mined extensively before SMCRA was enacted. That historic surface mining polluted the South Fork Pound

River watershed by exposing toxic overburden material, which weathered and leached, causing acidic surface runoff and seepage. Discharges from pre-SMCRA underground mining have also polluted the watershed.

The federal Environmental Protection Agency ("EPA") delegated to Virginia's Department of Mines, Minerals, and Energy's Division of Mined Land Reclamation ("DMLR") the authority to issue NPDES permits under the CWA. DMLR also has the authority to issue SMCRA permits. In 1992, DMLR issued combined CWA and SMCRA permit numbered 1101401/0081401 ("Permit") for the Mine to conduct coal surface mining operations and to discharge pollutants under the CWA. The coal mining operation included remining of previously mined areas. The Permit requires Red River to reclaim the mining area according to current standards. DMLR encourages remining because it is a way to reclaim land that was mined before SMCRA's enactment that would not otherwise be reclaimed, aiding restoration of water quality.

A hollow or valley fill is made up of excess spoil or overburden material removed during mining. The fill is simply a place to put the excess material. Generally, channels are created to route water around the fill. Any water that gets into the fill drains into an underdrain at the bottom of the fill, which is designed to convey water (both percolating groundwater and water running through the fill). Discharges from nearby underground mines, also known as deep mines, may also

flow into an underdrain. If there is a sedimentation pond in place, the water from the channels around the fill and the water collected in the underdrain are both conveyed into the sedimentation pond before being discharged into a water body. If there is no sedimentation pond, the water from the channels and the water from the underdrain may discharge directly into a body of water such as a creek or stream.

Red River deposited mine spoil into eight hollow fills, each of which has an underdrain. Until June 2014, Fill 1 and Underdrain 1 discharged into Pond 1 and through Outfall 001 into a tributary of the South Fork Pound River. Fill 2 and Underdrain 2, as well as Fill 3 and Underdrain 3, discharged into Pond 2 and through Outfall 002 into a different tributary of the South Fork Pound River. Fill 4 and Underdrain 4, as well as Fill 5 and Underdrain 5, discharged into Pond 5 and through Outfall 003 into another tributary of the South Fork Pound River. Fill 6 and Underdrain 6 discharged into Pond 9 and through Outfall 006 into a tributary of Rat Creek, which flows into the South Fork Pound River downstream from the other discharges.

On April 29, 2014, DMLR authorized Red River to remove Ponds 3 and 4. On June 11, 2014, DMLR authorized Red River to remove Ponds 1, 2, 5, 6, and 9. Underdrains 1, 2, 3, 4, 5, and 6 now all discharge directly into tributaries or

streams without passing through any sedimentation pond or other treatment system.

On February 26, 2015, in a document titled Monitoring Point Detail Supplement, DMLR authorized the deletion of Outfall 003 from Red River's NPDES permit. In the same document, DMLR authorized the relocation of NPDES monitoring locations for Outfalls 001, 002, and 006. The monitoring points were previously below the fills but were moved to new locations up slope of the fills at mine bench Ponds 1B, 3B, and 7B. Red River has not reported any discharges from these mine bench ponds.

Underdrains 1, 2, 3, 4, 5, and 6 continue to produce discharges high in TDS and with high conductivity, contributing to elevated levels in the streams into which the underdrains discharge. These elevated levels have harmed aquatic life in the streams, which the Virginia Department of Environmental Quality has designated as impaired based on macroinvertebrate bioassessments.

For purposes of its motion, Red River concedes that the underdrains are point sources under the CWA.[1] At this time, the underdrains are not listed as outfalls or point sources in the Permit. The Permit continues to require underdrain

---

[1] As SAMS points out, this is contrary to the position Red River and DMLR have taken in past communications with EPA and others, and in pleadings filed with this court. It is, however, consistent with expert testimony offered by SAMS.

monitoring. The underdrains are discharging calcium, magnesium, sulfate, and bicarbonate.

The Permit states that Red River "is hereby authorized to conduct coal surface mining and reclamation operations in Virginia and to discharge from a facility into receiving waters, aforementioned, in accordance with the requirements, conditions and limitations set forth in this permit, and all plans approved for this permit." Mem. Supp. Mot. Summ. J. Ex. 3 at 2, ECF No. 43-3. The Permit then goes on to list specific monitoring points and effluent limitations, along with requirements for sampling. The Permit does not expressly incorporate Virginia water quality standards or include a condition requiring compliance with state regulations.

Over the years following issuance of the permit, Red River submitted several applications for renewal of the Permit. As part of its renewal applications, Red River submitted monitoring data from the underdrains. The 2016 renewal of the Permit, which is currently in effect, states that Red River

> is authorized to discharge from the facility listed below in compliance with the provisions of the Clean Water Act as amended and pursuant to the State Water Control Law and regulations adopted pursuant thereto and in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in Sections A, B, C, and D of this permit and the plans and requirements found in joint CSMO/NPDES permit number 1101401/0081401 and any and all subsequent approved permitting actions.

*Id.* Ex. 7 at 2, ECF No. 43-7. The "facility listed below" is "North Fox Gap Surface Mine." *Id.* The "receiving waters" listed are "Rat Creek and South Fork Pound River." *Id.* Ex. 3 at 2, ECF No. 43-3.[2]

The Permit requires Red River to monitor suspended solids, iron, manganese, TDS, conductivity, and acidity, among other things, at specified sites. The 2016 renewal of the Permit states,

### NPDES Outfall Description:

>    NPDES outfalls associated with this permit result from the control of surface water runoff resulting from precipitation and/or groundwater discharges from coal mining activities associated with mining. Treatment facilities may include sedimentation structures, chemical treatment such as the addition of neutralizing agents or flocculants, or no treatment (in the case of direct discharge of underground mine drainage when treatment is not required to meet applicable effluent limitations). The following details describe the treatment facility or source associated with each approved outfall. Specific information regarding each outfall and facility is found in Section V and Section XII of the CSMO/NPDES permit.

*Id.* Ex. 7 at 3, ECF No. 43-7. The Permit then goes on to list specific effluent limitations at delineated outfalls. The Permit requires monitoring of TDS, but sets no numeric TDS limit, and Virginia has not adopted a numeric water quality standard for TDS.

In its initial permit application for the Mine, submitted in 1991, Red River provided sampling data from 1988 through 1991, which included testing for TDS

---

[2] The renewals of the Permit each incorporate the terms of the original 1992 Permit.

and conductivity. Red River disclosed that "[a]s areas are disturbed during mining, suspended solids concentrations in runoff will increase." *Id.* Ex. 9 at 40, ECF No. 43-9. Red River stated,

> [s]ediment control structures will remain in place until the disturbed area controlled has been stabilized. After vegetation is well established and ponds have been removed, suspended solids concentrations will be approximately the same as prior to mining in non-remining areas. Suspended solids reaching receiving streams should be reduced during and after mining in the remine area.

*Id.* Red River represented that it would construct hollow fills and monitor discharges at the underdrains of the hollow fills, and the Permit required monitoring for TDS at the underdrains. Red River indicated in its permit application that preexisting discharges from the hollow fills and underdrains were of poor quality. However, it predicted that there would be a significant improvement in water quality once remining and reclamation had been completed.

A DMLR procedure document details the process for removal of sedimentation ponds following reclamation. According to the procedure, pond removal cannot begin until data shows there have been no problematic discharges or effluent limit exceedances for at least the past six months. The removal of the pond triggers a plan modification and eliminates the NPDES monitoring point from the Permit.

DMLR's organizational designee, Rodney Baker, testified in a deposition that DMLR would have considered the monitoring data submitted by Red River

when deciding on the effluent limitations and other conditions of the permit. Baker testified that sedimentation ponds are intended to control runoff during mining operations and that once reclamation is complete, the ponds are no longer necessary and are expected to be removed. However, DMLR does not require removal of the ponds at a particular time or pressure a coal company to remove them promptly until after approval has been sought and granted. The ponds must be removed in order for the coal company's reclamation bond to be released.

According to Baker, under the Permit, Red River is "authorized to discharge from the facility, but they are required to specify those locations where the monitoring will be conducted and where the effluent limitations apply." *Id.* Ex. 2 at 57, ECF No. 43-2. He went on to clarify that "the permit does apply to the facility" but "they have to identify each location that has a discharge where monitoring effluent limitations are applicable and are required." *Id.* at 58. Baker testified that as of the date of his deposition, Red River had complied with the Permit.

In October 2015, DMLR issued a draft renewal of the Permit that omitted the underdrains as outfalls. By letters dated November 25, 2015, and January 28, 2016, EPA objected to the draft renewal of the Permit because it considerd the underdrains to be point sources that were discharging pollutants without permit

authorization, in violation of the CWA.[3]   The EPA wrote that its objection was

"based on the fact that the permit does not contain sufficient conditions to ensure

compliance with water quality standards and does not contain effluent limitations

consistent with the assumptions and requirements of wasteload allocations

established through the South Fork Pound River Total Maximum Daily Load

(TMDL)."   SAMS's Resp. Opp'n Mot. Summ. J. Ex. 10 at 2, ECF No. 49-10.

"[T]here remain discharges from the original outfall locations to the South Fork

Pound River watershed and those discharges continue to contribute TDS to the

watershed."  *Id.* at 3.  The EPA emphasized that post-bond-release discharges were

still subject to regulation under the CWA and must be permitted.[4]   The EPA

instructed DMLR that the "ongoing discharge from the original outfall locations

needs a permit, regardless of whether the discharges are deemed to be associated

with active mining activity."  *Id.*   The EPA wrote that "[p]ursuant to Section

---

[3]      The EPA's Office of Surface Mining, Reclamation and Enforcement
("OSMRE") has opined, however, that it does not "have the authority to determine
whether an NPDES permit is required for a particular discharge" and that only DMLR
can make that determination, "with oversight from the [EPA]."   SAMS's Resp. Opp'n
Mot. Summ. J. Ex. 1 at 3, ECF No. 49-1.

[4]   OSMRE, the federal agency that oversees mining in Virginia, appears to agree
with the EPA.  It has informed DMLR that "[r]emoval of ponds does not negate the
obligations for compliance with water quality standards."  *Id.* Ex. 15 at 7, ECF No. 49-
15.  "If water that is not in compliance with permit conditions or the approved program is
leaving the site, the DMLR is obligated to require treatment."  *Id.*  Nevertheless, OSMRE
found that DMLR had not acted arbitrarily with respect to the pond removals and related
actions and that "[t]he best management practices required by the DMLR are an
appropriate mechanism for assuring compliance with TMDLs."  *Id.* at 9.

402(d) of the CWA and EPAs regulations at 40 CFR §§ 122.4(c) and 123.44, a final NPDES permit shall not be issued unless and until the EPA's objections have been resolved." *Id.* at 4.

On March 15, 2016, Red River wrote to DMLR regarding the EPA's objections, stating that the objections were meritless. Red River explained its position as follows:

> Where a sediment control pond has been removed, reclaimed and re-vegetated as part of post-mining reclamation and bond release, the physical "point source" conveyance is removed and thus drops out of the NPDES permit program. Any underdrain that was constructed in connection with a hollow fill and that remains post-reclamation and/or post-bond-release serves only to convey groundwater flow, which is regulated — if at all — under the SMCRA program, not the NPDES permit program.

*Id.* Ex. 11 at 5, ECF No. 49-11. Red River "agree[d] that a point source discharge is subject to NPDES permitting regardless of whether mining is in progress or complete. But the determination of whether a point source discharge exists" is, according to Red River, a question of fact and law to be decided by DMLR. *Id.* at 6.

By letter dated April 8, 2016, DMLR responded to EPA's objection. DMLR wrote:

> No constructed discharges or siltation structures exist at the original discharge locations but water quality information representative of those locations is required. In order to help ensure compliance with Virginia's narrative water quality standards, routine benthic macroinvertebrate surveys and testing of thirty-nine water

- 11 -

quality parameters — including all the metals analyses typically of mine effluent characterization — are required of Rat Creek and the South Fork Pound River.

*Id.* Ex. 12 at 3, ECF No. 49-12.  DMLR went on to state:

> Because DMLR believes that this permit contains sufficient conditions to ensure compliance with water quality standards and is consistent with the assumptions and requirements of waste load allocations established for the South Fork of the Pound River, we respectfully request EPA to lift their objections to the renewal of this permit.

*Id.*  The EPA did not lift or withdraw its objection, but when DMLR did not receive a response from the EPA for several months, it issued the renewed Permit on August 5, 2016.  The EPA subsequently informed DMLR that it considered the renewed Permit to be invalid because the EPA's objection remained in place.

Virginia has both numeric and narrative water quality standards, and the narrative standards include a biological component that is assessed by, among other things, monitoring benthic macroinvertebrates.  DMLR's internal guidance requires the agency to assess compliance with both kinds of standards.  The DMLR inspector who approved removal of the ponds did not complete any written assessment of the biological monitoring data relevant to the narrative standards.  Rather, he appears to have analyzed only compliance with the numeric water quality standards.  Samples collected by Red River's contractor as part of aquatic life benthic monitoring showed that instream conductivity in the South Fork of the

Pound River and Rat Creek increased between the fall of 2015 and the fall of 2016, after the ponds below the hollow fills were removed.

In November 2017 and May 2018, SAMS representatives conducted sampling at the points where the hollow fills discharge and at points downstream in the water bodies that receive discharges from the underdrains. This sampling data showed that TDS and conductivity levels were significantly higher than the pre-mining levels reported by Red River in its 1991 permit application. Despite these elevated levels, DMLR and Red River consider reclamation to be complete.

By letter dated September 20, 2016, the EPA informed Red River that it considered Red River to be violating the CWA by discharging pollutants from point sources into waters of the United States without permit authorization. The EPA stated that it had concluded that Red River was not complying with the Permit and that the Permit was not properly issued. The EPA invited Red River to negotiate a resolution with the agency before the EPA pursued a judicial or administrative enforcement action. Red River expressed a willingness to meet with EPA personnel, but the outcome of any negotiations is not apparent from the record before me.

II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must grant summary judgment when "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

The substantive law applicable to the case determines which facts are material. *Anderson*, 477 U.S. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

## A. STANDING.

SAMS has moved for partial summary judgment to establish that it has standing to assert its claims. Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (en banc). SMCRA's citizen suit provision similarly allows "any person having an interest which is or may be adversely affected" to "commence a civil action on his own behalf to compel

compliance with" SMCRA. 30 U.S.C. § 1270(a). Likewise, RCRA provides that any person can file suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to" RCRA or "against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1). In order to bring a citizen suit, a plaintiff must first comply with the notice requirements set forth in the CWA, SMCRA, and RCRA. *See* 33 U.S.C. § 1365(b) (requiring notice to be given at least 60 days before filing suit); 30 U.S.C.A. § 1270(b) (same); 42 U.S.C. § 6972(b)(2) (requiring notice to be given at least 90 days before filing suit).

"To establish Article III standing, [plaintiffs] must allege that (1) they suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 400 (4th Cir. 2018).

Where, as here, the plaintiff is an organization bringing suit on behalf of its members, it must satisfy three requirements to secure

organizational standing: (1) that its members would have standing to sue as individuals; (2) that the interests it seeks to protect are germane to the organization's purpose; and (3) that the suit does not require the participation of individual members.

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). "At least one plaintiff must demonstrate standing for each claim and form of requested relief." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).

In support of its motion, SAMS has filed declarations of organizational members Jessica Bier and Matthew Hepler. Bier lives on property that is adjacent to the Mine, and one of the Mine's hollow fills is located on her property. In her declaration, she explains in detail the ways in which she believes Red River's actions have interfered with her use and enjoyment of the streams on her property and have diminished the value of her property. She also states that she has incurred additional expenses in her business because the stream next to her home is polluted. Hepler works for one of the plaintiff organizations and previously worked for another of the plaintiff organizations. As part of his work, he collects water samples from streams in the area of the Mine. He asserts that Red River's actions have harmed and continue to harm the aquatic life in the streams, preventing him from enjoying the aquatic life when he visits the bodies of water. SAMS also submitted a declaration of J. Michael Becher, an attorney representing the plaintiffs in this action, asserting that he provided the required notice under the relevant federal statutes.

Red River does not contest that the plaintiffs have standing, either constitutional or statutory. Based on the averments in the declarations of Bier and Hepler, I find that the plaintiffs have satisfied the requirements of Article III standing as to each claim and form of relief sought, and they have asserted justiciable claims over which this court has jurisdiction. I further find that they have complied with all applicable statutory notice requirements. I will therefore grant SAMS's Motion for Partial Summary Judgment on Jurisdictional Issues.

## B. CLEAN WATER ACT.

The NPDES permit system is an exception to the CWA's general prohibition of the "discharge of any pollutant by any person." 33 U.S.C. § 1311(a). The CWA authorizes the EPA to issue NPDES permits that "define[], and facilitate [] compliance with, and enforcement of," a discharger's obligations to comply with the general water quality standards enumerated in the CWA. *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976). The CWA authorizes EPA to delegate to states the authority to administrate their own NPDES programs to govern discharges within their borders, subject to EPA approval. *See* 33 U.S.C. § 1342(b); *see also Ohio Valley Envtl. Coal. v. Miano*, 66 F. Supp. 2d 805, 807 (S.D.W. Va. 1998) ("The federal NPDES program allows a state to take control of the permitting process within its borders, so long as it complies with the federal standards set forth by the Clean Water Act and the regulations promulgated under

that act."). Thus, a person or entity can lawfully discharge a pollutant from a point source into the waters of the United States if it has a permit authorizing it to do so. *See Sierra Club v. Va. Elec. & Power Co.*, 903 F.3d 403, 407–08 (4th Cir. 2018).

"To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). The statute contains no causation requirement and "takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur." *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010). The CWA's definition of "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A regulation promulgated under the CWA defines "discharge of a pollutant" as "[a]ny addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source.'" 40 C.F.R. § 122.2. "This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man . . . ." *Id.* With respect to Red River's Motion for Summary Judgment, the elements of the CWA claim at

issue are whether the discharges are from point sources and whether they are without permit authorization.

*1. Point Sources.*

It is clear from the record that both DMLR and Red River believe that the underdrains that remain following sedimentation pond removal are not point sources and are not subject to regulation under the CWA. Red River has averred in the companion case pending in this court that "the alleged sources of pollution, underdrains and associated hollow fills, are not 'point sources' and thus not subject to regulation under the CWA." Compl. ¶ 3, *Red River Coal Co. v. Sierra Club*, No. 2:17CV00021(W.D. Va. June 30, 2017), ECF No. 1; *see also id.* ¶ 28. Indeed, Red River has pleaded in this very case that "Plaintiffs' claims are barred, in whole or in part, because they relate to discharges from non-point sources." Answer to Am. Compl. 2, ECF No. 35. In denying Red River's Motion to Dismiss on the issue of whether SAMS had adequately pleaded that the discharges in question were from point sources, I held that "the record currently before me does not contain sufficient facts for me to rule as a matter of law that the underdrains in question are not point sources." Op. & Order 25, ECF No. 31.

Red River now purports to "concede[], for purposes of this motion only, that the discharges from the underdrains at the North Fox Gap Mine come from point sources as defined by the CWA." Mem. Supp. Mot. Summ. J. 22, ECF No. 43.

Red River essentially asks me to assume without deciding that the underdrains are point sources, but to find as a matter of law that discharges from the underdrains are allowed under the Permit. SAMS is justifiably concerned about this conditional concession because it expects that upon conclusion of this litigation, Red River will again proceed according to its understanding that the underdrains are not point sources and do not require NPDES permit authorization. Red River's conditional concession also creates a significant problem with respect to SAMS's RCRA claim, which SAMS pleaded in the alternative to address these discharges if the court were to conclude that the underdrains are not point sources subject to CWA regulation. By "conceding" a fact that has the potential to subject it to liability under the CWA, Red River simultaneously attempts to avoid liability under RCRA without ever obtaining any judicial resolution of the point source issue.

Red River cannot manipulate the litigation in this way. Either there is a factual dispute as to whether the underdrains are point sources, which the factfinder must resolve, or the undisputed facts reveal that the underdrains are or are not point sources under the CWA's definition. "[T]here cannot be a tentative or conditional admission on motion for summary judgment, which by definition posits that there are not in truth any unresolved issues of material fact which must be tried if the wheel turns wrong." *Lloyd v. Franklin Life Ins. Co.*, 245 F.2d 896,

897 (9th Cir. 1957). "A concession of fact on motion for summary judgment establishes the fact for all time between the parties. The party cannot gamble on such a conditional admission and take advantage thereof when judgment has gone against him." *Id.*; *see also Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 753-54 (7th Cir. 2001).

It is undisputed that the underdrains were designed to collect and convey water, and that they do in fact discharge water into tributaries and streams. They clearly meet the CWA's definition of point source. *See* 33 U.S.C. § 1362(14). This conclusion is further supported by the expert report of John Tyner, Ph.D., who has opined that each valley fill and its associated underdrain is a point source. Reply Mem. Ex. 15 at 7, ECF No. 52-2. I therefore find that the undisputed facts warrant the conclusion that the underdrains at issue in this case are point sources.

Because the underdrains are point sources, in order to be compliant with the CWA, discharges of pollutants from the underdrains must either be expressly authorized by a permit or allowed based on the so-called permit shield defense. *See Sierra Club v. Shell Oil Co.*, 817 F.2d 1169, 1173 (5th Cir. 1987) (explaining that effluent limitations, set forth in a permit, "are to be applied to all point sources of discharge at a facility"). Red River argues that discharges of TDS from the underdrains are allowed here on either ground; SAMS disagrees as to both grounds.

## 2. The Permit.

NPDES permits are interpreted applying principles of contract interpretation. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 269 (4th Cir. 2001). Where the permit's language is unambiguous, the language itself will determine the permit's meaning. If the language is ambiguous, however, the court may consider extrinsic evidence in interpreting the permit. *Id.* at 269-70. As the Supreme Court of Virginia has held:

> The court must give effect to all of the language of a contract if its parts can be read together without conflict. Where possible, meaning must be given to every clause. The contract must be read as a single document. Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties.

*Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983).

Red River characterizes the Permit as a facility-wide general permit that allows it to discharge pollutants from anywhere on the Mine site rather than from specified point sources.[5] Red River insists that the Permit unambiguously authorizes it "to discharge from a facility into receiving waters," rather than limiting discharges to specific outfalls. Mem. Supp. Mot. Summ. J. Ex. 3 at 2, ECF No. 43-3. Of course, the quoted language is followed by the words "in

---

[5] Red River also argues that the entire facility is one point source, but that argument makes little sense when one considers the statutory definition of point source, and it runs afoul of the Fourth Circuit's recent analysis in *Sierra Club v. Va. Elec. & Power Co.*, 903 F.3d 403 (4th 2018). There, the court explained that a point source must make a discrete conveyance. *Id.* at 410–11. The entire Mine site cannot be said to function as a discrete conveyance of pollutants.

accordance with the requirements, conditions and limitations set forth in this permit, and all plans approved for this permit." *Id.* Red River contends that the Monitoring Point Detail Supplement issued after pond removal only changed the locations for monitoring and did not in any way limit Red River's permission to discharge pollutants from the underdrains. Red River construes the Permit as one single permit that makes no distinction between the CWA and SMCRA requirements, and it notes that it continues to monitor discharges from the underdrains and to provide that data to DMLR following pond removal as it did prior to pond removal. Red River characterizes the Permit as allowing discharges from anywhere on the Mine site and "simply impos[ing] effluent limitations and/or monitoring requirements at specific location, including at each of the underdrains." Mem. Supp. Mot. Summ. J. 17, ECF No. 43.

SAMS argues that the "from a facility" phrase is merely prefatory language and that the Permit goes on to specify outfalls and effluent limitations, which SAMS interprets as the exclusive list of point sources from which discharges are permitted under the Permit. SAMS asserts that the Permit either clearly does not allow discharges from other unnamed point sources or is ambiguous, thus allowing the court to consider extrinsic evidence of the parties' intent. SAMS construes the Permit's requirements as separated by statute. According to SAMS, the effluent limitations and listed outfalls address the CWA requirements, while the monitoring

required at the underdrains addresses groundwater regulation under SMCRA. Thus, in SAMS's view, the Permit's requirement of monitoring at the underdrains does not give Red River authorization to discharge pollutants from the underdrains under the CWA, as neither DMLR nor Red River consider the underdrains to be point sources.

A careful review of the 1992 permit and its subsequent revisions is necessary in order to develop a construction of the Permit as a whole. The Permit is called a "Combined Permit to Conduct Coal Surface Mining Operations (CSMO) and to Discharge Under the National Pollutant Discharge Elimination System (NPDES)." *Id*. Ex. 3 at 2, ECF No. 43-3. It lists two separate permit numbers, a CSMO permit number and a NPDES permit number. It allows Red River "to discharge from [the Mine] into [Rat Creek and South Fork Pound River] . . . in accordance with the requirements, conditions, and limitations set forth in this permit, and all plans approved for this permit." *Id.* Those specific requirements, conditions, limitations, and plans are many. A later revision of the Permit contains a similar but lengthier recitation, stating that Red River

> is authorized to discharge from the [Mine] in compliance with the provisions of the Clean Water Act as amended and pursuant to the State Water Control Law and regulations adopted pursuant thereto and in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in Sections A, B, C, and D of this permit and the plans and requirements found in joint CSMO/NPDES permit number 1101401/008401 and any and all subsequent approved permitting actions.

*Id*. Ex. 7 at 2, ECF No. 43-7.  That renewal contains a section captioned "NPDES

Permit Definitions" which includes the following definitions:

> (N)  "Discharge (of a pollutant)" means any addition of any
> pollutant or combination of pollutants to waters of the United States
> from any point source; or any addition of any pollutant or
> combination of pollutants to the waters of the contiguous zone or
> ocean from any point source other than a vessel or other floating craft
> which is being used as a means of transportation.
>
> . . . .
>
> (P)  "Effluent limitation" means any restriction imposed by the
> Director on quantities, discharge rates, and concentrations of
> pollutants that are discharged from point sources into waters of the
> Untied States, the waters of the contiguous zone, or the ocean.
>
> . . . .
>
> (CC)  "Outfall" means a point source.

*Id.* at 24-25.  This 2016 renewal also includes separate general and special

conditions for the NPDES permit and the CSMO permit, suggesting that while this

is a combined Permit, its portions dealing with the CWA and SMCRA are

separable.

Prior to removal of the sedimentation ponds, the Permit listed specific

effluent limits at seven specific numbered outfalls, 001 through 007.  For some

listed NPDES outfalls, effluent limits are listed as "NL," which "indicates

monitoring is required with no limitations."  *Id.* at 4.  The inclusion of such

effluent limits suggests that discharges of pollutants from other point sources on

the Mine site into the listed bodies of water are not permitted. This is consistent with the Permit's definitions of discharge and effluent limitation.

Revisions to the Permit refer to underdrains as sites for groundwater monitoring, which suggests, consistent with other record evidence and with Red River's prior arguments in this case, that DMLR and Red River do not consider the underdrains to be subject to CWA regulation because they view them as discharging into groundwater rather than surface water. The Permit packets include separate NPDES Effluent Limitations Tables and Ground Water Monitoring Report Forms. *See, e.g.*, *Id*. Ex. 5 at 3, ECF No. 43-5. The DMLR Fact Sheet separately lists "NPDES DISCHARGE SITES," which include the numbered outfalls, and "GROUNDWATER MONITORING SITES," which include the underdrains. *See*, *e.g.*, *id.* at 6. It is reasonable, then, to interpret the Permit as essentially two separate permits in one, covering CWA/NPDES and SMCRA. It is clear that DMLR and Red River consider the underdrains not to be covered by the NPDES portion of the permit. While this is obviously based on the language of the various Permit documents alone, it is also supported by extensive extrinsic evidence in the record. However, I do not need to consider that extrinsic evidence in reaching this conclusion.

While Red River's suggestion that the Permit allows discharges on a facility-wide basis at first seems to be a straightforward interpretation of the Permit's

language, that interpretation would render the Permit's NPDES effluent limits superfluous. Reading the Permit as a whole, I find it unambiguous that the general authorization to discharge pollutants from the Mine into receiving waters is limited to the specific listed point sources and their effluent limits. Otherwise, there would have been no reason for DMLR to have included the specified outfalls and effluent limits. The only logical interpretation of the Permit is that discharges from point sources not listed are not expressly allowed.

The Monitoring Point Detail Supplement dated February 26, 2015, noted deletion of the sedimentation ponds, deletion of certain outfalls, and relocation of other outfalls. The parties agree that the Permit does not list outfalls or effluent limits for the underdrains. Based on my interpretation of the unambiguous Permit, the NPDES portion of the Permit in its current state thus does not authorize discharges of pollutants from the underdrains.

### 3. *Permit Shield.*

Even where a permit does not expressly authorize certain discharges, however, they may be allowed under the permit shield provision of the CWA. *See* 33 U.S.C. § 1342(k). Red River contends that the CWA's permit shield defense protects it from liability for discharges from the underdrains because DMLR was aware of those discharges but chose not to list them in the Permit.

The permit shield applies when:

(1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was issued.

*S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 565 (4th Cir. 2014) (quoting *Piney Run*, 268 F.3d at 259).

There is no question that Red River has disclosed discharges from the underdrains to DMLR on an ongoing basis for many years. DMLR was well aware of the underdrains and the monitoring data when it issued the various Permit renewals. It reasonably anticipated TDS and conductivity levels from the underdrains. The Permit specifically mentions the underdrains, although it classifies them as sites for groundwater monitoring rather than as NPDES outfalls. DMLR chose to regulate the underdrains under the SMCRA portion of the Permit rather than under the NPDES portion, but it clearly knew that there would be discharges of TDS or conductivity from the underdrains and chose not to place specific limits on those discharges.

SAMS argues that Red River cannot avail itself of the permit shield because the permit shield only protects discharges of unlisted pollutants from listed point sources. According to SAMS, the permit shield cannot apply where a permit fails to cover a point source at all. In making this argument, it relies on a 1995 EPA guidance document. Red River notes that in addition to being dated, the 1995 EPA

document was merely a policy statement and not the product of a formal rulemaking process, and it is therefore not entitled to any deference. SAMS also points to *National Wildlife Federation v. Consumers Power Co.*, 657 F. Supp. 989, 1009 (W.D. Mich. 1987), *rev'd on other grounds*, 862 F.2d 580 (6th Cir. 1988), wherein the district court stated, "That defendant has secured a permit for certain point source discharges at the facility thus does not preclude plaintiff form arguing that there are other point source discharges at the facility for which the Court should also require defendant to secure permits." SAMS also cites *Legal Environmental Assistance Foundation, Inc. v. Hodel*, 586 F. Supp. 1163, 1168–69 (E.D. Tenn. 1984), for the proposition that a permit allowing discharges from one point source does not allow discharges from other point sources. In response, Red River cites the more recent decision in *Tennessee Clean Water Network v. TVA*, 206 F. Supp. 3d 1280, 1300 (M.D. Tenn. 2016), *rev'd on other grounds*, 905 F.3d 436 (6th Cir. 2018), in which the court wrote that "[n]othing in the text of the permit shield provision, however, suggests that it should apply differently to violations based on the location of the discharge than it does to violations based on which pollutants are involved."

SAMS's argument elevates form over substance and would undermine the purpose of the permit shield. Neither the Fourth Circuit nor any other court of

appeals has made the distinction that SAMS attempts to draw.  In *Piney Run*, the

Fourth Circuit plainly held,

> We therefore view the NPDES permit as shielding its holder from liability under the Clean Water Act as long as (1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not within the reasonable contemplation of the permitting authority at the time the permit was granted.

268 F.3d at 259.  Both requirements are satisfied here.

The undisputed evidence demonstrates that Red River has done what DMLR

has told it to do.  Red River should be able to rely upon the clear directives of its

regulators without being subjected to liability.  The EPA disagrees with what

DMLR has required, but it would be unfair to place Red River in the middle of a

battle between federal and state regulators.  The EPA or SAMS are free to take

legal action against DMLR, but DMLR is not a party to this litigation.  By being

completely forthcoming with DMLR and complying with the express terms of its

Permit, Red River has met its obligations under the CWA and is entitled to rely on

the permit shield.  I will therefore grant Red River's Motion for Summary

Judgment as to the CWA claim.

## C.  SMCRA.

The theory of SAMS's SMCRA claim is that Red River's SMCRA permit

requires it to comply with Virginia's SMCRA performance standards, which in

turn require compliance with all applicable state and federal water quality laws, standards, and regulations. A state regulation provides that Virginia waters must be free from substances or waste that "are inimical or harmful to human, animal, plant, or aquatic life." 9 Va. Admin. Code § 25-260-20(A). Another regulation states that surface mining and reclamation activities must be conducted in a way that will "prevent material damage to the hydrologic balance outside the permit area." 4 Va. Admin. Code § 25-130-816.41(a). SAMS alleges that by causing violations of these standards, Red River is violating its SMCRA permit. The regulation also requires that if typical reclamation and remedial practices are inadequate to meet water quality standards, "the permittee shall use and maintain the necessary water treatment facilities or water quality controls." *Id*. at (d)(1). SAMS contends that because the reclamation methods employed are inadequate to ensure compliance with the applicable standards, Red River is violating its SMCRA permit by failing to construct an appropriate treatment system.

Red River argues that SAMS's SMCRA claim is barred by SMCRA's savings clause. That clause states, "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing" various laws, including the CWA. 30 U.S.C. § 1292. Red River asks this court to adopt the reasoning of the Sixth Circuit in *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015), which appears to be the only case directly addressing the issue presented here. In

*ICG Hazard*, the court held that where a discharger complies with the CWA based on application of the permit shield, SMCRA's savings clause prohibits a finding of liability under SMCRA for the same discharges. *Id.* at 291. The court reasoned,

> The permit shield is not an absence of regulation but a substantive element of regulation under the CWA that affords consistent treatment to NPDES permit holders nationwide. To hold, in connection with the very same selenium discharges, that ICG is in compliance with Kentucky water quality-based effluent limitations for purposes of the CWA but in violation of those same water quality standards under [SMCRA] would create an inconsistency or conflict in regulatory practice, in direct contravention of § 702(a)(3).

*Id.*

SAMS disagrees with the Sixth Circuit's conclusion in *ICG Hazard*. It notes that the CWA expressly requires discharges to comply with "any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to any State law or regulations." 33 U.S.C. § 1311(b)(1)(C). As noted above, a regulation promulgated under SMCRA requires that "[d]ischarges of water from areas disturbed by surface mining activities shall be made in compliance with all applicable State and Federal water quality laws and regulations." 30 C.F.R. § 816.42. According to SAMS, adopting Red River's broad savings clause argument would negate the SMCRA provision that expressly allows for more stringent state regulations of surface coal mining and reclamation operations. *See* 30 U.S.C. § 1255(b). SAMS notes that OSMRE has taken the position that water quality standards are enforceable for discharges from the

underdrains.  SAMS argues that application of SMCRA's savings clause as Red River suggests "would not 'save' the CWA or SMCRA, but instead would destroy them."  SAMS Resp. Opp'n Mot. Summ. J. 31, ECF No. 49.

Although the *ICG Hazard* decision is not binding on this court, I will adopt its reasoning and hold that SAMS's SMCRA claim is barred by the savings clause in § 702.  It is true that the CWA and SMCRA impose separate obligations that can be independently enforced.  *See Sierra Club v. Powellton Coal Co.*, 662 F. Supp. 2d 514, 534 (S.D.W. Va. 2009).  But while the state narrative water quality standards are not themselves inconsistent with the CWA, applying them here as SAMS seeks to do would impermissibly circumvent the CWA.  The SMCRA claim asserted by SAMS is based on the very same discharges that are protected by the CWA's permit shield.  A finding that Red River has complied with the CWA but has violated SMCRA based on the same discharges would allow SMCRA to override the CWA's permit shield and would thus violate SMCRA's savings clause.  I will therefore grant Red River's Motion for Summary Judgment as to the SMCRA claim.

## D. RCRA.

SAMS has indicated that it will pursue its RCRA claim only if the court finds that the underdrains are not point sources subject to regulation under the

CWA.  Because I have found that the underdrains are point sources, I will grant

Red River's Motion for Summary Judgment as to the RCRA claim.

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Partial

Summary Judgment, ECF No. 54, is GRANTED, and the Motion for Summary

Judgment, ECF No. 42, is GRANTED.  A separate final judgment will enter

herewith.

ENTER:  September 24, 2019

/s/ *James P. Jones*
United States District Judge